STATE OF CONNECTICUT *v.* BOBBY GROOMES
(15122)

PETERS, C. J., and CALLAHAN, BORDEN, BERDON and NORCOTT, Js.

Argued January 12—decision released March 28, 1995

*Elizabeth M. Inkster*, assistant public defender, for the appellant (defendant).

*Mary H. Lesser*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *James G. Clark*, assistant state's attorney, for the appellee (state).

CALLAHAN, J. This appeal concerns several issues arising out of the criminal trial of the defendant, Bobby Groomes. The defendant appealed[1] from his convictions of twenty-four separate counts that were tried together to a jury. He was convicted of one count of burglary in the first degree as an accessory; General Statutes §§ 53a-101 (a) (1) and 53a-8;[2] one count of robbery in the first degree; General Statutes §§ 53a-134 (a) (4)[3] and 53a-8; one count of larceny in the second degree

---

[1] The defendant appealed from the judgments of conviction of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c).

[2] General Statutes § 53a-101 provides in relevant part: "BURGLARY IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of burglary in the first degree when he enters or remains unlawfully in a building with intent to commit a crime therein and: (1) He is armed with explosives or a deadly weapon or dangerous instrument . . . ."

General Statutes (Rev. to 1991) § 53a-8 provides in relevant part: "CRIMINAL LIABILITY FOR ACTS OF ANOTHER. (a) A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

[3] General Statutes (Rev. to 1991) § 53a-134 provides in relevant part: "ROBBERY IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of robbery in the first degree when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime . . . (4) displays or threatens the use of what he represents by his words or conduct to be a pistol, revolver, rifle, shotgun, machine gun or other firearm, except that in any prosecution under this subdivision, it is an affirmative defense that such pistol, revolver, rifle, shotgun, machine gun or other firearm was not a weapon from which a shot could be discharged. Nothing contained in this subdivision shall constitute a defense to a prosecution for, or preclude a conviction of, robbery in the second degree, robbery in the third degree or any other crime."

General Statutes § 53a-133 provides: "A person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny."

as an accessory; General Statutes §§ 53a-123 (a) (1)[4] and 53a-8; two counts of burglary in the second degree; General Statutes § 53a-102;[5] one count of attempted burglary in the third degree; General Statutes §§ 53a-103 and 53a-49;[6] and eighteen counts of burglary in the

[4] General Statutes § 53a-123 provides in relevant part: "LARCENY IN THE SECOND DEGREE: CLASS C FELONY. (a) A person is guilty of larceny in the second degree when he commits larceny as defined in section 53a-119 and: (1) The property consists of a motor vehicle, the value of which exceeds five thousand dollars . . . ."

General Statutes § 53a-119 provides in relevant part: "A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. . . ."

[5] General Statutes § 53a-102 provides in relevant part: "BURGLARY IN THE SECOND DEGREE: CLASS C FELONY. (a) A person is guilty of burglary in the second degree when he enters or remains unlawfully in a dwelling at night with intent to commit a crime therein. . . ."

[6] General Statutes § 53a-103 provides in relevant part: "BURGLARY IN THE THIRD DEGREE: CLASS D FELONY. (a) A person is guilty of burglary in the third degree when he enters or remains unlawfully in a building with intent to commit a crime therein. . . ."

General Statutes § 53a-49 provides: "CRIMINAL ATTEMPT: SUFFICIENCY OF CONDUCT; RENUNCIATION AS DEFENSE. (a) A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he: (1) Intentionally engages in conduct which would constitute the crime if attendant circumstances were as he believes them to be; or (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime.

"(b) Conduct shall not be held to constitute a substantial step under subdivision (2) of subsection (a) of this section unless it is strongly corroborative of the actor's criminal purpose. Without negating the sufficiency of other conduct, the following, if strongly corroborative of the actor's criminal purpose, shall not be held insufficient as a matter of law: (1) Lying in wait, searching for or following the contemplated victim of the crime; (2) enticing or seeking to entice the contemplated victim of the crime to go to the place contemplated for its commission; (3) reconnoitering the place contemplated for the commission of the crime; (4) unlawful entry of a structure, vehicle or enclosure in which it is contemplated that the crime will be committed; (5) possession of materials to be employed in the commission of the crime, which are specially designed for such unlawful use or which can serve no lawful purpose of the actor under the circumstances; (6) possession, collection or fabrication of materials to be employed in the

third degree. General Statutes § 53a-103. In a subsequent court trial, the defendant also was convicted of being a persistent serious felony offender; General Statutes § 53a-40 (b);[7] and was sentenced to a total effective sentence of seventy-five years incarceration.

The facts are undisputed. There had been a large increase in the number of burglaries in the Westville area of the city of New Haven beginning in the first week of August, 1991. In many of the burglaries, garages were broken into and bicycles were taken. In response, Detective Frederick Hurley and Officer Michael Pachesa of the New Haven police department conducted a stakeout in Westville on the night of September 14, 1991. The two officers, dressed in plain clothes, patrolled the area in a pickup truck.

The defendant was a suspect in the recent burglaries because he had been convicted of similar burglaries in the same area. Moreover, he had been released from prison in early August, 1991. Not only were the officers aware of this information, but they also knew that the defendant lived about one-half mile from Westville,

---

commission of the crime, at or near the place contemplated for its commission, where such possession, collection or fabrication serves no lawful purpose of the actor under the circumstances; (7) soliciting an innocent agent to engage in conduct constituting an element of the crime.

"(c) When the actor's conduct would otherwise constitute an attempt under subsection (a) of this section, it shall be a defense that he abandoned his effort to commit the crime or otherwise prevented its commission, under circumstances manifesting a complete and voluntary renunciation of his criminal purpose."

[7] General Statutes § 53a-40 (b) provides: "A persistent serious felony offender is a person who (1) stands convicted of a felony, and (2) has been, prior to the commission of the present felony, convicted of and imprisoned under an imposed term of more than one year or of death, in this state or in any other state or in a federal correctional institution, for a crime. This subsection shall not apply where the present conviction is for a crime enumerated in subdivision (1) of subsection (a) of this section and the prior conviction was for a crime other than those enumerated in subsection (a) of this section." None of the crimes of which the defendant had been convicted is enumerated in § 53a-40 (a).

in the Valley Street projects. The officers had a picture of the defendant with them during the stakeout.

At about 1:30 a.m. on September 14, 1991, Hurley saw the defendant riding a bicycle on Willard Street in Westville. There was nothing on the bicycle other than the defendant, and he did not appear to have anything on his back. The officers followed the defendant and saw him enter the backyard of a house on Willard Street, where, they knew, he did not live. The officers thereafter unsuccessfully searched several backyards on Willard Street, looking for the defendant. Forty to forty-five minutes later, the officers returned to their truck and resumed their patrol of the area.

Shortly after resuming their patrol, the officers saw the defendant riding a bicycle on Barnett Street, also in Westville. At that time, the officers observed that the defendant had a backpack on his back and had an aluminum attache case strapped to the back of the bicycle, neither of which had been in his possession earlier. As the officers drove the truck toward the defendant, he jumped off the bicycle and ran into the backyard of a house, leaving the bicycle on the sidewalk. After calling for backup, the officers followed the defendant into the backyard, shouting "Police, stop."

Andrew Faggio, a uniformed officer who responded to the backup call, subsequently apprehended the defendant in front of a school on Fountain Street. When Hurley arrived at the school, Faggio was trying to handcuff the defendant. Hurley noticed that the open backpack and books it contained bore the name Josh Forrest, which he knew was not the defendant's name. Hurley then performed a pat down search for weapons[8]

---

[8] The pat down search yielded a screwdriver, wrench and pliers, which, Hurley testified, often are used as burglary tools, as well as wires for a video cassette recorder that were hanging out of the defendant's pocket.

and placed the defendant under arrest, orally advising him of his *Miranda*[9] rights.

The defendant indicated that he was willing to cooperate with the officers and took them to where he had hidden a video cassette recorder (VCR) that he had taken from a residence at 140 McKinley Avenue that night. After recovering the VCR, the officers and the defendant returned to the abandoned bicycle. There they found a video camera in the aluminum attache case, and a red duffle bag containing a Nintendo video game machine, video game cartridges and frozen food. In the bushes in the backyard on Barnett Street where the defendant had gone initially when he had run from the officers, they also found a flashlight, a metal bar and other tools, all of which were consistent with tools used to burglarize buildings.

The officers next went to 140 McKinley Avenue where, the defendant had told the officers, he had stolen the recovered items. The defendant stated to the officers that he had gained access to the house by passing through a backyard on Willard Street, where the officers had seen the defendant earlier. After waking the occupants of 140 McKinley Avenue, the officers asked if anything was missing from their home. An occupant informed the police that a VCR, video camera, Nintendo machine and cartridges and frozen food were missing. In addition, the occupant verified that his son's book bag was missing, and that his son's name was Josh Forrest.

---

[9] See *Miranda* v. *Arizona*, 384 U.S. 436, 469–73, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966) ("The warning of the right to remain silent must be accompanied by the explanation that anything said can and will be used against the individual in court. . . . [A]n individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation . . . [and] if he is indigent a lawyer will be appointed to represent him.").

The officers then took the defendant to the police station where Hurley again read him the *Miranda* rights, this time from a waiver form. After reading the rights form, the defendant initialled the waivers and signed the form at the bottom. He stated that he was willing to tell the officers about other burglaries that he had committed, and agreed to show the officers the locations of these burglaries. Hurley took a number of reports that had been filed concerning recent burglaries in the Westville area, and went with Pachesa to drive the defendant around the neighborhood.

As they drove, the defendant pointed out garages or homes that he had entered and told the officers how he had gained entry and what he had taken. Hurley was able to match the details of what the defendant told him with many of the available burglary reports. The defendant indicated some locations, however, for which there were no reports, and there were some reported burglaries to which the defendant did not admit. He refused to sign a written statement regarding the burglaries. The defendant subsequently was charged only in connection with burglaries of those homes which he orally confessed to having burglarized. Additional facts will be discussed as necessary in connection with the defendant's specific claims.

The defendant claims on appeal that the trial court improperly: (1) denied his motion for severance; (2) denied his motion to suppress his confession and his motion to suppress physical evidence that flowed from an illegal investigative stop; (3) instructed the jury on flight as consciousness of guilt and as independent circumstantial evidence of the defendant's guilt; and (4) failed to elicit, on the record, a waiver by the defendant of his right to a jury trial on the persistent serious felony offender charge. We affirm the judgment of the trial court.

## I

The defendant first claims that the trial court improperly denied his motion for severance. Before trial, the defendant argued that he would be prejudiced substantially by the consolidation in a single trial of all of the counts with which he was charged and that trial of all the incidents should be severed from each other. The defendant offered four reasons in support of his motion for severance: first, the "very fact [that] they're all very similar crimes would prejudice him"; second, the weight of cumulative evidence might persuade the jury that the defendant must have done something wrong and influence them to convict him when separate trials might lead to acquittals on some or all of the individual counts; third, the jury might use evidence in one case improperly when considering guilt of another; and fourth, the defendant's decision to testify might be influenced by the consolidation because he might wish to testify regarding only one or several of the charges, but not all of the charges.

The court denied the motion to sever. It found that the facts of the separate cases were not complex, the factual situation would not be inflammatory and the central piece of evidence would be the confession of the defendant, which included all the offenses.

On appeal, the defendant again argues that the trial court improperly rejected his arguments for severance, "but narrows the claim to focus on the compelling need for severing the first three counts (the armed robbery, burglary and car theft from the Bango residence); from the 21 cat burglaries . . . ." In this court, in other words, the defendant has not argued, as he did at trial, that all counts of the information should have been severed, but has focused instead only on the severance of the first three counts of the information. These

counts charged the defendant with being an accessory to burglary in the first degree, robbery in the first degree and larceny in the second degree, and arose from an incident that occurred at the residence of the Bango family, located at 40 Alston Avenue in Westville on August 24, 1991.

Joseph Bango testified at trial concerning that incident. He testified that at around 3 a.m. on August 24, he was asleep in the sun porch of his home while his parents were asleep on the second floor. He heard a noise that woke him and saw two figures approaching him in the dark. He reached for his hand gun, which was next to him, but hesitated because he thought that one of the figures may have been his father. He thereafter was struck in the head and told to face the wall. There were two people in the room with him, one of whom took his gun, which he knew to be loaded and operable. One of the men then held him at gunpoint while the other searched the house. Bango described the intruder who searched the house as older and more aggressive and referred to him as the leader. He described the man who held him at gunpoint as younger and less aggressive, even apologetic. He said that the perpetrator who had his gun was fascinated with it, asking if it was a "Clint Eastwood" gun and if it was loaded. Bango answered in the affirmative to both questions.

Bango further testified that both of the perpetrators threatened to kill him if he did not tell them where they could find money. The leader also forced him to identify and turn over the keys to his car. While the leader was outside at the car, Bango convinced the younger intruder to let him go upstairs, where his parents were sleeping, to get some money. When the leader reentered the house and saw the two halfway up the stairs, however, he ordered them both downstairs and went upstairs himself. Bango then heard his mother scream

and he ran to the basement to get a rifle. The intruders fled in his car. The police later found the car, without its battery, in a parking lot in the Valley Street projects near the defendant's home.

At trial, the defendant was ordered to speak aloud for a possible voice identification. Bango identified the defendant's voice as that of the younger perpetrator, but said he was only 60 percent sure of this voice identification.

The defendant argues on appeal that the charges arising out of this incident should have been severed from the twenty-one other charges because of the dissimilarities between the Bango incident and the other burglaries. He argues that the "emotionally charged and prejudicial evidence" regarding this incident influenced the outcome of the case. The defendant claims that this issue was preserved for review. We disagree.

Before the trial court, the defendant argued only that the *similarity* of all of the charges mandated severance of all of them. There is no basis in the record for the defendant's argument on appeal that the *dissimilarity* of the first three counts compelled severance of those charges. " 'This court will not consider claimed errors on the part of the trial court unless it appears that the question was distinctly raised at the trial and was ruled upon and decided by the trial court . . . .' *State* v. *Simms*, 170 Conn. 206, 208, 365 A.2d 821, cert. denied, 425 U.S. 954, 96 S. Ct. 1732, 48 L. Ed. 2d 199 (1976); Practice Book § 4185."[10] *Skrzypiec* v. *Noonan*, 228 Conn. 1, 13, 633 A.2d 716 (1993). The claim posited by the defendant on appeal, i.e., that the first three counts of the information should have been severed because of the dissimilarity of the Bango inci-

---

[10] Practice Book § 4185 provides in relevant part: "The court on appeal shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. . . ."

dent to the other burglary counts, was not raised at trial and, therefore, the issue was not properly preserved.

In declining to review this claim of the defendant, we do not erect or rely on a technical barrier to review. Rather, we reassert the fundamental principle that, if the defendant deems an action of the trial court necessary to the fairness of his trial, he has a responsibility to present such a claim clearly to the trial court so that the trial court may consider it and, if it is meritorious, take appropriate action. That is the basis for the requirement that ordinarily a defendant must raise in the trial court the issues that he intends to raise on appeal.

In this case, by urging the trial court to sever all of the counts on the basis of their inherent similarity, the defendant in effect deflected the trial court from any consideration of severance of the first three counts on the basis of their prejudicial *dissimilarity* with respect to the other twenty-one counts. To countenance on appeal the defendant's claim regarding the first three counts would be to impose an untenable burden on the trial court and would amount to appeal by ambuscade. We decline to do so.[11]

The defendant asserts, in the alternative, that the trial court's denial of severance with regard to these

[11] The defendant has not merely "narrowed" his claim on appeal as stated by the dissent, but has changed it completely. We refuse to review the defendant's claim not because it is not a "mirror image" of the claim he raised at trial, but because it is an entirely different claim. *State* v. *Boscarino*, 204 Conn. 714, 529 A.2d 1260 (1987), and *State* v. *Herring*, 210 Conn. 78, 554 A.2d 686, cert. denied, 492 U.S. 912, 109 S. Ct. 3230, 106 L. Ed. 2d 579 (1989), cited by the dissent, are inapposite because the severance sought in the trial court in those cases was the same as that pursued on appeal. The dissent seems to place some importance on the length of the defendant's sentence in determining whether severance should have been granted. We find no authority for such a proposition, nor has the dissent cited any.

three counts was plain error that denied him a fair trial. "The court may in the interests of justice notice plain error not brought to the attention of the trial court." Practice Book § 4185. "It is also well established that plain error review is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Internal quotation marks omitted.) *State* v. *Kulmac*, 230 Conn. 43, 77, 644 A.2d 887 (1994); *State* v. *Boles*, 223 Conn. 535, 551, 613 A.2d 770 (1992); *State* v. *Wright*, 207 Conn. 276, 288–89, 542 A.2d 299 (1988); *State* v. *Miller*, 202 Conn. 463, 469, 522 A.2d 249 (1987). The trial court did not commit plain error by failing to sever, sua sponte, the first three counts of the complaint.

## II

The defendant next claims that the trial court improperly denied his motion to suppress his confession and his motion to suppress physical evidence seized because, he argues, both his confession and the seized evidence flowed from an illegal investigative stop.[12] The defendant argues, relying on *State* v. *Oquendo*, 223 Conn. 635, 613 A.2d 1300 (1992), that the officers did not have a reasonable and articulable suspicion that a crime had been or was about to be committed when, upon their second sighting of the defendant, they pursued him into the backyard of a house on Barnett Street. We are not persuaded.

Under both the federal and state constitutions, police may detain an individual for investigative purposes if there is a reasonable and articulable suspicion that the individual is engaged in or about to engage in criminal

---

[12] The defendant does not argue that the officers lacked probable cause when they arrested him. Our inquiry, therefore, is limited to the issue of whether, prior to arrest, there was a stop made without a reasonable and articulable suspicion.

activity. *State* v. *Lamme*, 216 Conn. 172, 184, 579 A.2d 484 (1990). "[T]he police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that [stop]." *Terry* v. *Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). " 'Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable to show probable cause.' *Alabama* v. *White*, [496 U.S. 325, 330, 110 S. Ct. 2412, 110 L. Ed. 2d 301 (1990)]." *State* v. *Cofield*, 220 Conn. 38, 47–48, 595 A.2d 1349 (1991).

"A court reviewing the legality of a stop must therefore examine the specific information available to the police officer at the time of the initial intrusion and any rational inferences to be derived therefrom." *State* v. *Oquendo*, supra, 223 Conn. 654. "The determination of whether a reasonable and articulable suspicion exists involves a two-part analysis: (1) whether the underlying factual findings of the trial court are clearly erroneous; and (2) whether the conclusion that those facts gave rise to such a suspicion is legally correct." *State* v. *Kyles*, 221 Conn. 643, 660, 607 A.2d 355 (1992). We must determine, therefore, whether the trial court's conclusion that the police had a reasonable and articulable suspicion when the officers observed the defendant running into a backyard on Barnett Street was legally and logically consistent with the facts, including any reasonable inferences derived therefrom.[13]

---

[13] The trial court stated: "At this point the Court finds that the police had reasonable and articulable suspicion that a crime had been committed or was about to be committed; and that the police were justified in at least stopping the defendant to stop and question him; and that the police had a particularized and objective basis for suspecting the defendant of criminal activity." The court went on to find that officers chased the defendant

We determine that the facts that the trial court reasonably found as the basis for its denial of the defendant's motion to suppress evidence adequately support the court's conclusion. With respect to the motion to suppress, the court found the following facts. Hurley and Pachesa were conducting a stakeout in the early morning hours on September 14, 1991, in an unmarked pickup truck in the Westville area. The officers were aware of the defendant's past convictions for burglary and that he had been released from incarceration in August, 1991. They considered him a suspect in the recent outbreak of burglaries in Westville. The officers had a picture of the defendant with them on the stakeout.

At approximately 1:30 a.m. the officers spotted the defendant riding a bicycle on Willard Street. The officers noticed nothing on the bicycle other than the defendant and he had nothing on his back. The defendant then ducked into a backyard on Willard Street that the officers knew was not his home. The officers followed the defendant into the backyard but were unable to locate him after searching for approximately forty-five minutes. The officers returned to their truck and resumed their patrol.

The officers next sighted the defendant riding a bicycle toward them on Barnett Street. They noticed that the defendant had something on his back and that there was something on the back of the bicycle. When their truck came to within fifty feet of the defendant, the defendant got off of the bicycle and ran into a back-

into the backyard and then shouted: "Police, stop." The court later concluded that there was probable cause to arrest the defendant when Hurley saw the backpack with someone else's name on it, and that the pat down search was lawful as incident to arrest. Because the defendant only claims that there was an illegal investigative stop, and does not claim that there was no probable cause for his arrest, we need not address the court's finding of probable cause.

yard on Barnett Street. The officers radioed for backup and then exited the truck to pursue the defendant.

The trial court concluded that at this point the officers had a reasonable and articulable suspicion that a crime had been committed or was about to be committed. The defendant claims that the facts of this case do not support that conclusion. Rather, he argues, the defendant was seized when the officers exited the truck, identified themselves as police officers and ordered the defendant to stop. We disagree.

The defendant likens the facts of his case to those in *State* v. *Oquendo*, supra, 223 Conn. 635. In *Oquendo*, a uniformed police officer in a marked police vehicle came upon two individuals in a residential area at approximately 12:50 a.m. The officer recognized the defendant's companion as someone who had been arrested recently on burglary charges. There also recently had been a series of burglaries in that neighborhood. The officer noticed that the defendant was wearing a zipped-up winter jacket on the warm August night and was carrying a duffel bag. The officer testified that he had a "hunch" that the defendant had committed or was about to commit a burglary. The officer, therefore, stopped near the defendant, exited the cruiser and questioned the individuals. When the officer was not satisfied with their story, he asked the defendant to approach the police car. When the defendant handed the duffel bag to his companion, the officer instructed the defendant to bring the duffel bag with him. In response, the defendant took the duffel bag from his companion and ran away, discarding the duffel bag in a wooded area. Id., 640–42.

This court concluded that, at the time the police officer in *Oquendo* had exited the cruiser to stop the defendant, the officer had not had a reasonable and articulable suspicion that a crime had been or was about to be com-

mitted. Therefore, the court held, the investigative stop of the defendant had been illegal. Id., 656–57. The court further concluded that, because the stop had been illegal, the defendant's flight from the officer after that stop could not be used retroactively to justify the stop. The court explained that "[w]hile a suspect's flight may, in certain cases, be considered in determining whether there existed a reasonable and articulable basis of suspicion . . . police conduct that *provokes* flight precludes the consideration of this factor." (Citation omitted; emphasis in original.) Id., 655–56; see also *Terry* v. *Ohio*, supra, 392 U.S. 19–20 (in evaluating reasonableness of investigative stop, court must determine "whether the officer's action was justified *at its inception*" [emphasis added]); accord *State* v. *Williamson*, 10 Conn. App. 532, 540, 524 A.2d 655, cert. denied, 204 Conn. 801, 525 A.2d 965 (1987), cited with approval in *State* v. *Oquendo*, supra, 223 Conn. 656.

Unlike the facts of *Oquendo*, the defendant's flight in this case properly could be considered in determining whether there existed a reasonable and articulable basis of suspicion, because the defendant began to flee *before* the police attempted to stop him. The trial court found that the defendant ran into the backyard on Barnett Street, having abandoned the bicycle before the officers even exited their unmarked vehicle. In this case, therefore, the defendant's flight was not an illegally provoked reaction that now is being used retroactively to justify the police officers' conduct. Rather, the flight was unprovoked, and it was observed by the officers before they took any action.

The defendant's flight, coupled with the other specific facts known to the officers at the time, gave rise to a reasonable and articulable suspicion that a crime had been committed or was about to be committed and therefore justified the investigative stop. After observing a known burglar go into a backyard of someone's

home at 1:30 a.m., seeing him again approximately forty-five minutes later carrying items that he had not had a short time before and seeing him flee into yet another backyard, the officers not only had more than an ample basis for a reasonable and articulable suspicion, but should have been summarily drummed out of the corps if they had failed to effectuate an investigative stop.

### III

The defendant next claims that the trial court improperly instructed the jury on the defendant's flight as consciousness of guilt and as independent circumstantial evidence of the defendant's guilt. The defendant's argument is twofold. First, he argues that the instruction on flight was not fair because it did not recite the possible innocent inferences to be drawn from flight. Second, the defendant argues that we should characterize inferences to be drawn from flight as argument, more appropriately presented to the jury by counsel than by the court. The defendant urges, in effect, that we should eschew precedent and no longer permit trial courts to give a flight instruction or that we should require that the instruction be expanded radically. We are not persuaded.

" 'We have stated: [f]light, when unexplained, tends to prove a consciousness of guilt. . . . Flight is a form of circumstantial evidence. Generally speaking, all that is required is that the evidence have relevance, and the fact that ambiguities or explanations may exist which tend to rebut an inference of guilt does not render evidence of flight inadmissible but simply constitutes a factor for the jury's consideration.' (Citation omitted; internal quotation marks omitted.) *State* v. *Holloway*, 209 Conn. 636, 651–52, 553 A.2d 166, cert. denied, 490 U.S. 1071, 109 S. Ct. 2078, 104 L. Ed. 2d 643 (1989). 'The fact that the evidence might support an innocent

explanation as well as an inference of a consciousness of guilt does not make an instruction on flight erroneous.' *State* v. *Wright*, 198 Conn. 273, 281, 502 A.2d 911 (1986)." *State* v. *Freeney*, 228 Conn. 582, 593–94, 637 A.2d 1088 (1994).

The trial court's jury instruction regarding flight[14] conformed to our case law. The defendant nevertheless claims that the instruction was improper because it was not evenhanded with regard to the possible innocent explanations for the defendant's flight.

In this case, however, the defendant did not testify or offer any independent evidence of other explanations for his flight. The court was not required to supply to the jury possible innocent explanations that the defendant himself had not offered. Indeed, even when there is such evidence, we have held that, although the trial court may, it is not required to "enumerate all the possible innocent explanations offered by the defendant." Id., 594.

The trial court properly instructed the jury that "if you find that the defendant's acts or flights showed consciousness of guilt, you *may* use that conclusion or infer-

---

[14] The trial court instructed the jury in relevant part: "The law of this State recognizes a [principle] known as admission by conduct. Certain conduct of a person may be considered by you to show a guilty knowledge or consciousness of guilt. When a person is on trial for a criminal offense, it is proper to show his conduct subsequent to the alleged criminal offense, which may fairly have been influenced by that act. Flight may indicate consciousness of guilt if the facts and circumstances support it. If you find that the defendant did flee or did hide from the police, following the commission of a crime alleged, you may find that such conduct and such action tend to show a guilty connection with that crime. [In other] words, any actions of the defendant subsequent to the criminal act alleged, which you find showed a guilty knowledge influenced by the criminal act itself may be used by you as circumstantial evidence of the defendant's guilt. That is if you find that the defendant's acts or flights showed consciousness of guilt, you may use that conclusion or inference as independent evidence of guilt along with the other facts of the case to determine whether or not he has been proven guilty of any one or more of the crimes charged."

ence as independent evidence of guilt *along with the other facts of the case* to determine whether or not he has been proven guilty . . . ." (Emphasis added.) The instruction did not create a presumption of guilt; *State* v. *Rosa*, 170 Conn. 417, 433, 365 A.2d 1135, cert. denied, 429 U.S. 845, 97 S. Ct. 126, 50 L. Ed. 2d 116 (1976); nor did it allow an inference of guilt unless the jury was convinced that flight emanated from a consciousness of guilt. " 'The probative value of evidence of flight depends upon all the facts and circumstances and is a question of fact for the jury.' *State* v. *Nemeth*, 182 Conn. 403, 408, 438 A.2d 120 (1980)." *State* v. *Wright*, supra, 198 Conn. 281. We conclude that the court's instruction on flight was proper.

We recently reiterated the appropriateness of the flight instruction in *State* v. *Freeney*, supra, 228 Conn. 582. The defendant has not presented any persuasive argument for us to abandon our precedents. We decline his invitation to do so.

## IV

The defendant's final claim is that the trial court failed to elicit, on the record, a proper waiver by the defendant of his right to a jury trial on the charge of being a persistent serious felony offender. The defendant argues that the record is silent as to the defendant's election of a court trial, and that the court improperly accepted defense counsel's "bare assertion" of the defendant's waiver. We disagree.

"The right to a jury trial in a criminal case is among those constitutional rights which are related to the procedure for the determination of guilt or innocence. The standard for an effective waiver of such a right is that it must be 'knowing and intelligent,' as well as voluntary. . . . This strict standard precludes a court from presuming a waiver of the right to a trial by jury from a silent record. . . . In determining whether this strict

standard has been met, a court must inquire into the totality of the circumstances of each case. . . . When such a claim is first raised on appeal [such as in this case], our focus is on compliance with these constitutional requirements rather than on observance of analogous procedural rules prescribed by statute or by the Practice Book." (Citations omitted; internal quotation marks omitted.) *State* v. *Williams*, 205 Conn. 456, 460–61, 534 A.2d 230 (1987).

Applying these principles, we conclude that the record is not silent with regard to the defendant's election of a court trial on the persistent serious felony offender charge. Rather, it was only the defendant who was silent. We decline to allow the defendant to preserve a ground for appeal merely by refusing to respond to the court's questions regarding whether he waived his right to a jury trial.

The facts are as follows. After a recess, which was called for the express purpose of allowing the defendant to confer with his attorney to determine whether he desired a jury trial, the following occurred:

"Mr. Moscowitz [Defense Counsel]: Your honor, I have had discussions with my client. My client indicates to me that he does wish to waive a trial by Jury, but wants a trial by Court. I would indicate for the record what I have advised him and he is basically not going along with my advice, but he did indicate to me verbally, during the short recess that he wished to waive the Jury.

"The Court: Now, Mr. Groomes you understand that you have the right to the Jury. Do you understand that sir? Mr. Groomes.

"Mr. Moscowitz: He's indicated to me that he's not going to respond to the Court. *I've indicated the problem in doing that.*

"The Court: Well, Mr. Groomes, if you refuse to answer and you really don't have to, but I gather that you have listened to Counsel and you are waiving the Jury." (Emphasis added.)

The defendant's refusal to respond to the court's questions does not constitute a silent record as to whether the defendant had waived his right to trial by jury. The record here reflects that, not only did the defendant discuss with his attorney the option of waiving a jury trial, but that he rejected the advice of his attorney by electing a court trial. The defendant's counsel indicated to the defendant the "problem" in not addressing the court in response to its canvass. What is reflected on the record is not a "bare" assertion by counsel, but rather a silent defendant who, through his attorney, made a voluntary, knowing and intelligent waiver of his right to a jury trial.

"The 'determination of whether there has been an intelligent waiver . . . must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.' " (Citations omitted.) *State v. Shockley*, 188 Conn. 697, 707, 453 A.2d 441 (1982). In this case, the defendant knew that he was expected to answer the court's questions and that he could address the court directly. Earlier in the proceedings the defendant had done so to request different counsel. Furthermore, the defendant had had prior experience with the criminal justice system.

We conclude, in light of the totality of the circumstances on the record, that the defendant waived his right to a jury trial on the persistent serious felony offender charge, and that his waiver was voluntary, knowing and intelligent.

The judgment is affirmed.

In this opinion PETERS, C. J., and BORDEN and NORCOTT, Js., concurred.

BERDON, J., dissenting. One of the principal issues in this appeal is whether the trial court, for trial purposes, should have severed the three serious felony counts from the twenty-one counts stemming from "cat burglaries."[1] The defendant, Bobby Groomes, was tried on all twenty-four counts in one trial, which resulted in convictions for which he received a total effective sentence of seventy-five years of imprisonment[2]—a sentence that is fifteen years longer than a life sentence in Connecticut.[3]

Prior to trial, the defendant moved generally to sever each of the twenty-four counts with which he was charged, arguing that a separate trial was needed for each. On appeal, however, the defendant has narrowed this claim. He now argues that of the twenty-four counts with which he was charged, only three should have been severed and tried separately. He claims that the more serious counts of aiding first degree burglary, aiding first degree robbery and aiding second degree larceny—all of which stemmed from the single incident at the Bango home—should have been severed from the less serious counts constituting the twenty-one "cat burglaries." He bases his argument largely on our decisions in *State* v. *Boscarino*, 204 Conn. 714, 529 A.2d 1260 (1987), and *State* v. *Herring*, 210 Conn. 78, 554 A.2d 686, cert. denied, 492 U.S. 912, 109 S. Ct. 3230, 106 L. Ed. 2d 579 (1989).

---

[1] The defendant labels as "cat burglaries" those burglaries of "garages and/or sunrooms/porches" in which "no weapons were involved, no occupants were ever aware of the intruder (much less held at gunpoint and threatened with death), and no cars were stolen."

[2] The defendant was sentenced as a persistent serious felony offender. The first twenty-five years of his seventy-five year sentence are based on his conviction under the first and second counts, aiding first degree burglary and aiding first degree robbery, respectively. The next twenty years are based on his conviction under the third count, aiding second degree larceny.

[3] "Life imprisonment" is defined as a sentence of sixty years. General Statutes § 53a-35b.

The majority declines to address this issue because the defendant failed to articulate his narrower claim for severance with requisite specificity before the trial court. Concluding that "[t]he claim posited by the defendant on appeal" is not the mirror image of the one he urged at trial, the majority refuses to address it.

I believe the court is wrong for two reasons. First, this court has stated unequivocally that a defendant's failure to articulate a severance claim at trial is not grounds for refusing to review the issue on appeal. In *State* v. *Herring*, supra, 210 Conn. 95 n.16, the state argued that this court should decline to address the defendant's claim for severance because he had failed to articulate the legal basis for severance before the trial court. We rejected this argument: "We disagree with the state's contention that we should limit our review of this claim because the defendant failed to raise any of the specific *Boscarino* factors as grounds for severance at the trial. *State* v. *Boscarino,* [supra, 204 Conn. 722–24]. Despite the general rule that 'this court will not consider claimed errors on the part of the trial court unless there has been a compliance with the provisions of [Practice Book § 4185]' . . . that rule cannot foreclose a review in the present circumstances. Several of the factors that we stressed in *State* v. *Boscarino* [supra, 721–22,] require hindsight in determining whether the defendant received a fair trial. While it may be relevant to consider whether the defendant raised the question of prejudice at trial or requested appropriate curative instructions, the effect of a denial of severance may be difficult to predict in advance of the actual testimony at trial." *State* v. *Herring,* supra, 95 n.16. This reasoning applies with equal force to this case. The majority, therefore, should address and rule on the defendant's narrow claim of severance.

Second, the plain error doctrine[4] demands that this court hear the defendant's claim. We have defined plain error to be those "situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the jury proceedings." *State* v. *Hinckley*, 198 Conn. 77, 87–88, 502 A.2d 388 (1985). The *Boscarino* factors, which we are to consider in determining whether counts should be severed for trial purposes, are "(1) whether the charges involved discrete, easily distinguishable factual scenarios; (2) whether the crimes were of a violent nature or concerned brutal or shocking conduct on the defendant's part; and (3) the duration and complexity of the trial." (Internal quotation marks omitted.) *State* v. *Herring*, supra, 210 Conn. 95; *State* v. *Boscarino*, supra, 204 Conn. 722–23. In this case, the three counts that the defendant argues should have been severed stemmed from the anomalous incident at the Bango home, which involved a gun and physical violence. Indeed, these three serious felony charges account for forty-five years of the defendant's seventy-five year sentence of imprisonment.

This court has emphasized that severance is necessary to avoid the "omnipresent risk . . . that although so much [of the evidence] as would be admissible upon any one of the charges might not [persuade the jury] of the accused's guilt, the sum of it will convince them as to all." (Citations omitted; internal quotation marks omitted.) *State* v. *Boscarino*, supra, 204 Conn. 721–22. Fundamental fairness and the integrity of our judicial system demand that we review the defendant's claim, reverse the convictions and order new trials with the serious felony charges severed from the "cat burglary" charges.

Accordingly, I respectfully dissent.[5]

---

[4] "The court may in the interest of justice notice plain error not brought to the attention of the trial court." Practice Book § 4185.

[5] In addition, I continue to be concerned about jury instructions on consciousness of guilt that are predicated on nothing more than the defendant's flight. See *State* v. *Freeney*, 228 Conn. 582, 602–609, 637 A.2d 1088 (1994) (*Berdon, J.*, dissenting).