STATE OF CONNECTICUT *v.* JAMES DAERIA
(AC 16678)

Lavery, Landau and Daly, Js.

Argued September 16—officially released December 1, 1998

*Glenn M. Conway*, special public defender, with whom, on the brief, was *Alexander H. Schwartz*, special public defender, for the appellant (defendant).

*Susann E. Gill*, senior assistant state's attorney, with whom, on the brief, were *Jonathan C. Benedict*, state's attorney, and *John C. Smriga*, senior assistant state's attorney, for the appellee (state).

*Opinion*

LAVERY, J. The defendant, James DaEria, appeals from the judgment of conviction, rendered after a jury trial, of attempt to commit murder in violation of General Statutes §§ 53a-49 and 53a-54a, assault in the first degree in violation of General Statutes § 53a-59 (a) (5), attempt to commit larceny in the second degree in violation of General Statutes §§ 53a-49, 53a-119 and 53a-123 (a) (2), conspiracy to commit larceny in the second degree in violation of General Statutes §§ 53a-123 (a) (2) and 53a-48, attempt to commit larceny in the third degree in violation of General Statutes §§ 53a-49, 53a-119 and 53a-124 (a) (1) and carrying a pistol without a permit in violation of General Statutes § 29-35 (a).[1]

On appeal, the defendant claims that the trial court improperly (1) denied his motion to suppress evidence

---

[1] The jury also found the defendant guilty of committing a class A, B or C felony with a firearm in violation of General Statutes § 53-202k. At a posttrial hearing, however, the trial court, pursuant to *State* v. *Dash*, 242 Conn. 143, 150, 698 A.2d 297 (1997), vacated the defendant's conviction for that offense.

that the police had obtained following a stop of his motor vehicle, (2) admitted into evidence clothing the police seized, without a warrant, as a seizure incident to a lawful custodial arrest and (3) denied both his motion to suppress incriminating oral statements he made to the police and his motion to suppress items the police seized from his vehicle. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On December 14, 1995, the victim, James Grosner, was at the home of his fiancee's parents, which is located on Graham Street in Stratford. At approximately 2:30 a.m., the victim heard a noise, and an alarm sounded almost immediately thereafter. The alarm belonged to a truck that was parked in the driveway. The victim looked out of a window and saw two men running away.

The victim exited the home and pursued the two individuals. When the victim reached the corner of Graham Street and High Park Avenue, he saw the two men enter a parked automobile. After several unsuccessful efforts to start the automobile, a man, later identified as the defendant, exited the car and took several steps toward the victim. The defendant raised his arm, and the victim saw a flash and heard a gunshot. The victim was struck in the leg by a bullet and retreated to the house while the defendant fired four additional shots.

The victim informed a police dispatcher that the perpetrators were driving a small, greenish Tercel[2] on High Park Avenue. Officer David McNeil of the Stratford police department was on patrol in the vicinity of High Park Avenue when a police dispatcher reported the incident. At the intersection of Stratford Avenue and Bruce Avenue, approximately four blocks from the location of the shooting, McNeil observed a small, gray

---

[2] A Tercel is a model of automobile manufactured by Toyota.

Toyota with three occupants. McNeil testified that he did not observe any other vehicles on the road from the time he received the dispatch until he observed the Toyota. McNeil activated his cruiser's strobe lights and attempted to pull over the Toyota because it matched the description of the vehicle involved, was the only vehicle in the area, was coming from the direction of the shooting and had several occupants. When McNeil activated his cruiser's strobe lights, the Toyota accelerated and a chase ensued.

When the Toyota struck a median on Washington Avenue in Bridgeport, the three occupants abandoned the vehicle. Officer Charles Johnson of the Bridgeport police department apprehended the defendant. Stratford police officers then arrested the defendant and took him into custody. The defendant was later identified as the owner of the Toyota.

Officer John Steedley transported the defendant to the Stratford police station. When they arrived at the police station, Steedley gave the defendant a form that listed his *Miranda*[3] rights. Steedley asked the defendant to review the waiver form, which the defendant reviewed and signed. Before Detectives Richard Yeomans and Nelson Dennean interviewed the defendant, Dennean read the defendant his *Miranda* rights. Dennean asked the defendant whether he understood his rights and was willing to waive them, and the defendant indicated that he was willing to speak with the detectives. During his interview with the detectives, the defendant made several incriminating statements.

Dennean also read a "consent to search" form to the defendant and asked him if he would authorize police officers to search his vehicle. The defendant reviewed the form and signed it. During a search of the defendant's vehicle, police officers discovered a flashlight, a

---

[3] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

dent puller and a screwdriver. At trial, Detective Robert Yakoubian testified that automobile thieves often use a dent puller to remove a vehicle's ignition so that the vehicle can be started with a screwdriver.

Shortly after the defendant arrived at the Stratford police station, Sergeant Christopher Marino removed a hooded sweatshirt and a pair of baggy pants from the defendant. Marino then placed these items on a hook outside the defendant's cell. While the defendant was in the holding cell, Officer Patrick Freer, who was with the victim at the hospital, spoke with Marino. Freer informed Marino that the victim described the shooter as wearing baggy pants and a hooded sweatshirt. Realizing that the defendant's sweatshirt and pants matched the description provided by the victim, Marino seized these items from the hook outside the defendant's cell.

I

We must first determine whether the trial court improperly denied the defendant's motion to suppress all of the evidence obtained by the authorities following McNeil's attempted stop of the defendant's vehicle. Specifically, the defendant claims that McNeil's activation of his police cruiser's strobe lights constituted a seizure within the meaning of article first, § 7, of the constitution of Connecticut.[4] Additionally, the defendant contends that this seizure violated his rights under our state constitution because it was not supported by a reasonable and articulable suspicion that his vehicle and its occupants were engaged in criminal activity.

"Our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is

---

[4] Article first, § 7, of the constitution of Connecticut provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Colvin*, 241 Conn. 650, 656, 697 A.2d 1122 (1997).

We must first determine whether McNeil seized the defendant within the meaning of article first, § 7, of our state constitution when he activated his cruiser's strobe lights. The state concedes that "under a reasonable reading of [*State* v. *Oquendo*, 223 Conn. 635, 613 A.2d 1300 (1992)], McNeil 'seized' the defendant the moment he activated his [strobe] lights." We will, therefore, assume, without deciding, that McNeil's actions constituted a seizure of the defendant.

We must next determine whether McNeil's seizure of the defendant was permissible under article first, § 7, of our state constitution. The defendant argues, relying on *State* v. *Oquendo*, supra, 223 Conn. 635, that McNeil did not have a reasonable and articulable suspicion that his vehicle and its occupants were engaged in criminal activity. We disagree.

"Under both the federal and state constitutions, police may detain an individual for investigative purposes if there is a reasonable and articulable suspicion that the individual is engaged or about to engage in criminal activity." *State* v. *Groomes*, 232 Conn. 455, 467–68, 656 A.2d 646 (1995). "Reasonable and articulable suspicion is an objective standard that focuses not on the actual state of mind of the police officer, but on whether a reasonable person, having the information available to and known by the police, would have had that level of suspicion." *State* v. *Torres*, 230 Conn. 372,

379, 645 A.2d 529 (1994); *State* v. *Januszewski*, 182 Conn. 142, 148–49, 438 A.2d 679 (1980), cert. denied, 453 U.S. 922, 101 S. Ct. 3159, 69 L. Ed. 2d 1005 (1981). "The police officer's decision . . . must be based on more than hunch or speculation." *State* v. *Cofield*, 220 Conn. 38, 45, 595 A.2d 1349 (1991). In justifying the particular intrusion, " '[t]he police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that [intrusion].' *Terry* v. *Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)." *State* v. *Groomes*, supra, 468. "Once a reasonable and articulable suspicion exists, the detaining officer may conduct an investigative 'stop' of the suspect to confirm or dispel his suspicions . . . ." *State* v. *Kyles*, 221 Conn. 643, 660, 607 A.2d 355 (1992).

"The determination of whether a reasonable and articulable suspicion exists involves a two-part analysis: (1) whether the underlying factual findings of the trial court are clearly erroneous; and (2) whether the conclusion that those facts gave rise to such a suspicion is legally correct. . . . The trial court's conclusions must stand unless they are legally and logically inconsistent with the facts." (Citation omitted; internal quotation marks omitted.) Id., 660–61.

The defendant does not maintain that the trial court's factual findings were clearly erroneous. Instead, he claims that the trial court's legal analysis of those facts was fundamentally flawed because the court used post-seizure facts retroactively to justify the seizure and found that the seizure took place only after the defendant's car had come to a stop in Bridgeport. We disagree.

"A court reviewing the legality of a stop must . . . examine the specific information available to the police officer *at the time of the initial intrusion* and any

rational inferences to be derived therefrom." (Emphasis added.) *State* v. *Oquendo*, supra, 223 Conn. 654. "These standards, which mirror those set forth by the United States Supreme Court in *Terry* v. *Ohio*, supra [392 U.S. 20–22], with regard to fourth amendment analysis, govern the legality of investigatory detentions under article first, §§ 7 and 9 of our state constitution." *State* v. *Oquendo*, supra, 654; see also *State* v. *Wilkins*, 240 Conn. 489, 507–508, 692 A.2d 1233 (1997).

In deciding whether McNeil had a reasonable and articulable suspicion sufficient to justify stopping the defendant's automobile, the trial court properly relied only on the information available to McNeil before he activated his cruiser's strobe lights and attempted to stop the defendant's vehicle.[5] Although the trial court also discussed events that occurred after McNeil had activated his strobe lights, it relied on this information only in deciding whether McNeil had sufficient probable cause to arrest the defendant once the chase terminated in Bridgeport.[6]

Having determined that the trial court did not rely on postseizure facts in its analysis, we must next determine

[5] The trial court found that "the stop of the defendant's vehicle . . . was fully justified, first, as a valid *Terry* stop, given the situation. It began—the incident—at approximately 2:29 a.m. and, again, going over the factors available to Officer McNeil, he saw no other vehicles at that hour on the road and, of course, given the conditions, I suppose that's not surprising; but there were in fact no other vehicles on the road. A greenish small vehicle was the description of the car with the suspects inside; this vehicle was primer gray; there were multiple people inside. Officer McNeil then pulled behind the defendant—the defendant's vehicle at which point the pursuit began. Again, I will find that all of this was proper. Officer McNeil had reasonable and articulable suspicion available to him in order to conduct at a minimum a preliminary inquiry as to that vehicle and the occupants of that vehicle."

[6] In referring to the events that occurred after McNeil had activated his strobe lights, the trial court stated that "all of the conduct thereafter, the factual findings of which I just recited concerning the chase, the no lights, the speeding, contributed of course to the basis for the ultimate stop [in Bridgeport] and arrest of the occupants [in the vehicle]."

whether the trial court's conclusion that McNeil had a reasonable and articulable suspicion that the defendant's vehicle and its occupants were engaged in criminal activity was legally and logically consistent with the facts available to McNeil at the time of the initial seizure, including any reasonable inferences drawn therefrom. It bears emphasis that "[r]easonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable to show probable cause." (Internal quotation marks omitted.) *State* v. *Groomes*, supra, 232 Conn. 468.

After considering all of the information available to McNeil at the time of the initial seizure, we conclude that the trial court properly determined that when McNeil activated his cruiser's strobe lights, he had a reasonable and articulable suspicion that the defendant's vehicle and its occupants were engaged in criminal activity. In reaching its decision, the trial court credited McNeil's testimony. " 'This court does not retry the case or evaluate the credibility of the witnesses.' *State* v. *Amarillo*, [198 Conn. 285, 289, 503 A.2d 146 (1986)]." *State* v. *Taylor*, 23 Conn. App. 426, 429, 580 A.2d 1004 (1990). "Rather, we must defer to the [trier of fact's] assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude." (Internal quotation marks omitted.) *State* v. *McClam*, 44 Conn. App. 198, 208, 689 A.2d 475, cert. denied, 240 Conn. 912, 690 A.2d 400 (1997).

McNeil testified that he first observed the defendant's car approximately four blocks from the crime scene shortly after the dispatcher reported the attempted larceny and shooting. In addition, McNeil testified that

the defendant's car was traveling away from the crime scene and turning onto Stratford Avenue, a main thoroughfare between Stratford and Bridgeport, which was commonly used as an escape route. "Proximity in time and place of the stop to the crime is highly significant in the determination of whether an investigatory detention is justified by reasonable and articulable suspicion." (Internal quotation marks omitted.) *State* v. *Aillon*, 202 Conn. 385, 400, 521 A.2d 555 (1987); see also *State* v. *Kyles*, supra, 221 Conn. 661 n.11; *State* v. *Aversa*, 197 Conn. 685, 691, 501 A.2d 370 (1985).

In addition, the trial court found that the defendant's vehicle and the number of occupants therein generally corresponded with the description broadcast by the police dispatcher. The police dispatcher informed McNeil that the perpetrators were driving a small, "greenish" Tercel. McNeil observed a small, gray Toyota with several occupants.[7] The presence of a discrepancy in the color and model of the vehicle reported by the dispatcher and that observed by McNeil does not, without more, undermine the trial court's finding that the seizure was supported by a reasonable and articulable suspicion. "The police . . . are not required to confirm every description of the perpetrator that is broadcast over the radio. What must be taken into account [when determining the existence of a reasonable and articulable suspicion] is the strength of those points of comparison which do match up and whether the nature of the descriptive factors which do not match is such that an error as to them is not improbable . . . ." (Internal quotation marks omitted.) *State* v. *Rodriguez*, 239 Conn. 235, 246–47 n.18, 684 A.2d 1165 (1996); *State* v. *Kyles*,

---

[7] The police dispatcher reported that the perpetrators were driving a small, greenish Tercel. McNeil testified that when he received the dispatch, he recognized a Tercel as a model of automobile manufactured by Toyota. When McNeil first saw the defendant's vehicle, he recognized it as a Toyota, but he could not specify the model. Later in the investigation, the police determined that the defendant's car was a Toyota Corolla.

supra, 221 Conn. 663; 3 W. LaFave, Search and Seizure (2d Ed. 1987) § 9.3 (d), pp. 465–66. In light of the fact that the victim observed the defendant's automobile at approximately 2:30 a.m., it was not unreasonable for McNeil to infer that due to less than optimal lighting conditions, the victim mistakenly identified the defendant's car as a Toyota Tercel as opposed to a Toyota Corolla. Moreover, under these lighting conditions, it was not improbable for the victim to misidentify the color of the defendant's vehicle.

Finally, the trial court attached significance to the time of day and the existing traffic conditions when McNeil first observed the defendant's vehicle. McNeil testified that he did not observe any other vehicles from the time he received the dispatch until he observed the defendant's vehicle. While the dispatcher's description of the defendant's vehicle and its occupants may have been too general reasonably to enable McNeil to single out the defendant's vehicle on a busy highway at rush hour, at approximately 2:30 a.m. on a deserted road approximately four blocks from the crime scene, the dispatcher's description was sufficiently distinctive to give rise to a reasonable and articulable suspicion of criminal activity. See *State* v. *Carter*, 189 Conn. 611, 617, 458 A.2d 369 (1983) (while description of black male wearing dungaree clothing might be too general in other contexts, at 3 a.m. close to scene of two recent burglaries, description sufficiently distinctive to give rise to reasonable and articulable suspicion that defendant had engaged in criminal activity).

We conclude, therefore, that the trial court properly denied the defendant's motion to suppress.

II

The defendant next claims that the trial court improperly allowed the introduction into evidence of a hooded sweatshirt and a pair of pants, which were seized from

him without a warrant following his arrest, in violation of article first, § 7, of the constitution of Connecticut. We disagree.

After his arrest, the defendant was taken to the Stratford police station. Marino was the desk sergeant on duty when the defendant arrived at the police station. Because an insufficient number of personnel were available when the defendant arrived at the station, Marino decided to place the defendant in a holding cell temporarily until another police officer could participate in the booking process. Before placing the defendant in a cell, however, Marino removed the defendant's personal effects and his outer clothing, which included a hooded sweatshirt and baggy pants. Marino placed the clothing on a hook outside the defendant's cell. Marino testified that he removed these items from the defendant for safety reasons.

While the defendant was in the holding cell, Freer, who was with the victim at the hospital, spoke with Marino. Freer informed Marino that the victim described the shooter as wearing baggy pants and a hooded sweatshirt. Realizing that the victim's description of the shooter's clothing matched the clothing that he had removed from the defendant, Marino seized the hooded sweatshirt and pants from the hook outside the defendant's cell.

The defendant claims that the trial court improperly admitted into evidence his hooded sweatshirt and pants because "there was no reason or recognized exception to the warrant requirement that justified Marino's seizure of the clothing." The trial court determined that despite Marino's failure to procure a warrant, the defendant's clothing was admissible into evidence because Marino properly seized these items incident to a lawful custodial arrest of the defendant.

"Ordinarily, police may not conduct a search unless they first obtain a search warrant from a neutral magistrate after establishing probable cause." *State* v. *Copeland*, 205 Conn. 201, 209, 530 A.2d 603 (1987). "[A] search conducted without a warrant issued upon probable cause is per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions. . . . One recognized exception to the warrant requirement is where the search has been undertaken incident to a lawful custodial arrest." (Citations omitted; internal quotation marks omitted.) Id. Under article first, § 7, of the constitution of Connecticut, our Supreme Court has "recognized that the police may make a search without a warrant incidental to a lawful custodial arrest." *State* v. *Delossantos*, 211 Conn. 258, 266, 559 A.2d 164, cert. denied, 493 U.S. 866, 110 S. Ct. 188, 107 L. Ed. 2d 142 (1989); see also *State* v. *Copeland*, supra, 208–13; *State* v. *Shaw*, 186 Conn. 45, 48, 438 A.2d 872 (1982); J. Bruckmann, G. Nash & J. Katz, Connecticut Criminal Caselaw Handbook (1992) pp. 107–108.

A

Relying on *State* v. *Miller*, 227 Conn. 363, 630 A.2d 1315 (1993), the defendant claims that the trial court improperly admitted into evidence his hooded sweatshirt and pants because the warrantless seizure of these items was not justifiable as a search and seizure incident to a lawful custodial arrest. Specifically, the defendant contends that the justifications for authorizing police officers to conduct a warrantless search and seizure at the time of his arrest no longer existed when he was transported to the police station. We disagree.

The defendant's reliance on *Miller* is misplaced for two reasons. First, the *Miller* court expressly limited its analysis to "noninventory searches of automobiles that have been impounded at police stations." Id., 377 n.14. In contrast, this case involves an entirely different

exception to the warrant requirement. In the present case, the trial court held that Marino's warrantless seizure of the defendant's clothing was permissible as a search and seizure incident to a lawful custodial arrest. The *Miller* court held that the principal justifications for allowing a police officer, pursuant to the automobile exception to the warrant requirement, to conduct a warrantless on-the-scene search—latent exigency and inherent mobility—no longer exist once an automobile has been impounded. Id., 383–85. Very different policy considerations, however, support the exception to the warrant requirement relied on by the trial court. "The search incident to an arrest exception to the warrant requirement has traditionally been justified by the reasonableness of searching for weapons, instruments of escape, and evidence of crime when a person is taken into official custody and lawfully detained." (Internal quotation marks omitted.) *State* v. *Copeland*, supra, 205 Conn. 210.

In addition, our case law establishes that " 'searches and seizures that could be made on the spot at the time of arrest may legally be conducted later when the accused arrives at the place of detention.' " *State* v. *Magnotti*, 198 Conn. 209, 214–15, 502 A.2d 404 (1985), quoting *United States* v. *Edwards*, 415 U.S. 800, 803, 94 S. Ct. 1234, 39 L. Ed. 2d 771 (1974). On several occasions, our Supreme Court has looked to *Edwards* for guidance in deciding whether a warrantless search and seizure incident to a lawful custodial arrest violates article first, § 7, of our state constitution. See *State* v. *Copeland*, supra, 205 Conn. 211–12; *State* v. *Castagna*, 170 Conn. 80, 87–88, 364 A.2d 200 (1976). In *Edwards*, the defendant claimed that a warrantless search and seizure of his clothing, conducted approximately ten hours after he was arrested and taken into custody, was constitutionally impermissible as a search and seizure incident to a lawful custodial arrest. *United States* v.

*Edwards*, supra, 800–802. In rejecting the defendant's argument, the United States Supreme Court reasoned that "searches and seizures that could be made on the spot at the time of the arrest may legally be conducted later when the accused arrives at the place of detention." Id., 803. Similarly, in *State* v. *Castagna*, supra, 87–88, our Supreme Court, relying on *United States* v. *Edwards*, supra, 804–805, held that a warrantless seizure of the defendant's clothing, which took place approximately six hours after he was arrested and taken into custody, was permissible as a search and seizure incident to a lawful custodial arrest. See *State* v. *Copeland*, supra, 211 ("once the accused is lawfully arrested and is in custody, the effects in his possession at the place of detention that were subject to search at the time and place of arrest may lawfully be seized without a warrant").[8]

The defendant neither contests the legality of his arrest, nor contends that the police could not lawfully have seized these items of clothing at the time of his arrest. Although Marino's warrantless seizure of the defendant's clothing occurred at the police station approximately one hour after his arrest, *Edwards* and *Castagna* establish that this seizure was reasonable and, therefore, permissible as incident to a lawful custodial arrest.

[8] In *State* v. *Copeland*, supra, 205 Conn. 212 n.4, our Supreme Court cautioned that the decision in *United States* v. *Edwards*, supra, 415 U.S. 800, was not to be interpreted as imposing no restraints on law enforcement officers. "This type of police conduct must [still] be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures." (Internal quotation marks omitted.) *State* v. *Copeland*, supra, 212 n.4; see *United States* v. *Edwards*, supra, 808 n.9. In *State* v. *Castagna*, supra, 170 Conn. 86–87, although our Supreme Court determined that a seizure which took place approximately six hours after the defendant was taken into custody did not violate article first, § 7, of the constitution of Connecticut, it nevertheless affirmed the contemporaneousness limitation imposed on law enforcement officers by *State* v. *Miller*, 152 Conn. 343, 347, 206 A.2d 835 (1965).

B

Relying on *State* v. *Joyce*, 229 Conn. 10, 639 A.2d 1007 (1994), the defendant next claims that the trial court improperly admitted into evidence his hooded sweatshirt and pants. We disagree.

The defendant's reliance on *Joyce* is also misplaced. In that case, the police took custody of the defendant's charred clothing pursuant to their community caretaking function. Id., 14–15. Thereafter, when the defendant became a suspect in an arson investigation, the police sent the clothing to the state forensic laboratory for testing without first procuring a warrant. Id. Our Supreme Court held that the state's chemical analysis of the defendant's clothing violated article first, § 7, of the constitution of Connecticut because the defendant had a reasonable expectation of privacy in the clothing, the chemical analysis constituted a search and the search was not justified by any recognized exception to the warrant requirement. Id., 21–28. Although the police lawfully obtained possession of the defendant's clothing pursuant to their community caretaking function, our Supreme Court reasoned that it was necessary for the police to procure a warrant because the community caretaking function is not a recognized exception to the warrant requirement, and the state was "unable to identify any [other] exception to the warrant requirement that could encompass the warrantless search of the defendant's clothes." Id., 27.

In sharp contrast, in the present case, Marino seized the defendant's clothing pursuant to a recognized exception to the warrant requirement. The trial court correctly decided that Marino's warrantless seizure of the defendant's clothing was justifiable as a search and seizure incident to a lawful custodial arrest. Given the legality of the defendant's arrest, a search and seizure of his clothing incident to that arrest required no addi-

tional justification. "[A] lawful custodial arrest creates a situation which justifies the contemporaneous search without a warrant . . . whether or not there is probable cause to search." *State* v. *Badgett*, 200 Conn. 412, 425, 512 A.2d 160, cert. denied, 479 U. S. 940, 107 S. Ct. 423, 93 L. Ed. 2d 373 (1986); see also *United States* v. *Robinson*, 414 U.S. 218, 235, 94 S. Ct. 467, 38 L. Ed. 2d 427 (1973) (custodial arrest of suspect based on probable cause is reasonable intrusion under the fourth amendment, and search incident to arrest requires no additional justification because lawful arrest establishes authority to search).

We conclude, therefore, that the trial court properly denied the defendant's motion to suppress.

## III

The defendant's final claim is that the trial court improperly denied both his motion to suppress the oral statements he made to the police and his motion to suppress the items seized from his vehicle. Specifically, the defendant contends that a learning disability precluded him from knowingly, intelligently and voluntarily waiving his *Miranda* rights and consenting to a search of his vehicle. We disagree. "Because the defendant did not advance a separate state constitutional argument, we will limit our analysis to federal constitutional grounds." *State* v. *Guess*, 39 Conn. App. 224, 231, 665 A.2d 126, cert. denied, 235 Conn. 924, 666 A.2d 1187 (1995).

## A

We first examine whether the defendant validly waived his *Miranda* rights. "To be valid, a waiver must be voluntary, knowing and intelligent. *Miranda* v. *Arizona*, 384 U.S. 436, 475, 478, 86 S. Ct. 1602, 16 L Ed. 2d 694 (1966) . . . . The state has the burden of proving by a preponderance of the evidence that the defendant

voluntarily, knowingly and intelligently waived his *Miranda* rights. . . . Whether a purported waiver satisfies those requirements is a question of fact that depends on the circumstances of the particular case. . . . Although the issue is therefore ultimately factual, our usual deference to fact-finding by the trial court is qualified, on questions of this nature, by the necessity for a scrupulous examination of the record to ascertain whether such a factual finding is supported by substantial evidence." (Citations omitted; internal quotation marks omitted.) *State* v. *Stanley*, 223 Conn. 674, 686, 613 A.2d 788 (1992).

"Whether the defendant has knowingly and intelligently waived his rights under *Miranda* depends in part on the competency of the defendant, or, in other words, on his ability to understand and act upon his constitutional rights. . . . Factors which may be considered by the trial court in determining whether an individual had the capacity to understand the warnings include the defendant's experience with the police and familiarity with the warnings . . . his level of intelligence, including his IQ . . . his age . . . his level of education . . . his vocabulary and ability to read and write in the language in which the warnings were given . . . intoxication . . . his emotional state . . . and the existence of any mental disease, disorder or retardation." (Citations omitted; internal quotation marks omitted.) *State* v. *Toste*, 198 Conn. 573, 580–81, 504 A.2d 1036 (1986).

After a careful review of the record, we conclude that the state has met its burden. There was substantial evidence from which the trial court could have found that the defendant knowingly and intelligently waived his *Miranda* rights. In making its decision, the trial court credited the testimony of several police officers and detectives. Steedley provided the defendant with

a form that contained his *Miranda* rights and told the defendant to ask questions if he did not understand the information contained in the form. The defendant reviewed the form and signed his name after each advisement of his *Miranda* rights. The defendant then reviewed and signed the lower portion of the form, waiving his *Miranda* rights. Steedley testified that the defendant appeared to comprehend what he was reading. Yeomans testified that he observed Dennean read the defendant his *Miranda* rights. When Dennean asked the defendant whether he understood his rights and was willing to waive them, the defendant stated that he was willing to speak with the detectives. "A defendant's express written and oral waiver is strong proof that the waiver is valid." (Internal quotation marks omitted.) *State* v. *Northrop*, 213 Conn. 405, 418, 568 A.2d 439 (1990); *State* v. *Chung*, 202 Conn. 39, 50–51, 519 A.2d 1175 (1987).

In making its decision, the trial court also attached significance to the defendant's conduct during an interview with detectives. Yeomans testified that during the interview, the defendant acted "pretty cocky." The defendant did not experience any difficulty communicating with Yeomans. Yeomans also stated that the defendant did not appear upset, frightened, ill or intoxicated, and he never asked to speak with an attorney or a family member. In addition, in light of his responses, the defendant appeared to comprehend the questions he was being asked. When the defendant learned that the victim had informed police officers that the shooter wore a hooded sweatshirt and baggy pants, clothing similar to what he was wearing, he terminated the interview. The defendant's decision to terminate the interview indicates that he understood his rights and invoked them when he chose to do so. See *State* v. *Usry*, 205 Conn. 298, 306, 533 A.2d 212 (1987).

At the suppression hearing, Janice Hill, who taught the defendant up until the sixth grade, testified that the defendant experienced great difficulty reading. In her opinion, even if the *Miranda* waiver form were read aloud to the defendant, he would find it difficult to comprehend. Hill testified that when the defendant completed the sixth grade, he was reading at a third grade level. On cross-examination, however, Hill admitted that her professional contact with the defendant ended when he completed the sixth grade. At the time of his arrest, the defendant was eighteen years of age.

Nancy DiNardo, the custodian of records for the Bridgeport school department, testified that the defendant attended special education classes for the learning disabled from first through eighth grades and that he withdrew from school in the ninth grade. On the basis of the defendant's records, DiNardo concluded that he was reading consistently below his grade level throughout his academic career. On cross-examination, however, DiNardo admitted that a psychological educational assessment, performed on the defendant at age seven, concluded that he possessed "the intellectual capacity to master grade level materials," "[h]is overall level of intellectual ability measured within the lower end of the high average range of intelligence" and his word comprehension "measured within a superior range of intelligence." This psychological assessment measured the defendant's potential to achieve.

Although the defendant introduced evidence that he experienced difficulty reading, our case law establishes that this evidence, without more, is insufficient to invalidate his waiver of rights. "Even some degree of mental retardation does not by itself prevent a defendant from knowingly and intelligently waiving his *Miranda* rights." *State* v. *Northrop*, supra, 213 Conn. 418 (valid waiver of *Miranda* rights despite evidence that defendant had learning disability); *State* v. *Usry*, supra, 205

Conn. 306–307 (valid waiver of *Miranda* rights despite defendant's young age, low IQ and status as special education student); *State* v. *Boscarino*, 204 Conn. 714, 744, 529 A.2d 1260 (1987) (valid waiver of *Miranda* rights despite testimony that defendant had low IQ and other deficiencies allegedly rendering him incapable of waiving his rights); *State* v. *Toste*, supra, 198 Conn. 581 (valid waiver of *Miranda* rights despite evidence that defendant operated at sixth or seventh grade level, had poor reading skills, had fairly low IQ and suffered from psychological disorder). The trial court properly concluded that the defendant knowingly and intelligently waived his *Miranda* rights.

The state must also prove, by a preponderance of the evidence, that the defendant's waiver of rights was voluntary. *State* v. *Northrop*, supra, 213 Conn. 419; *State* v. *Barrett*, 205 Conn. 437, 451–52, 534 A.2d 219 (1987). There is no evidence that police officers used threats or coercion or any overt psychological pressure to induce the defendant's waiver. Since the police did not utilize any coercive tactics, the defendant's federal constitutional claim is foreclosed by *Colorado* v. *Connelly*, 479 U.S. 157, 164, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986). In *Connelly*, the United States Supreme Court required "police overreaching as the crucial element in any inquiry into constitutional voluntariness." (Internal quotation marks omitted.) *State* v. *Northrop*, supra, 419. Accordingly, the trial court properly concluded that the defendant knowingly, intelligently and voluntarily waived his *Miranda* rights.

B

The defendant next contends that the trial court improperly denied his motion to suppress the evidence police officers seized from his vehicle. He claims that a learning disability precluded him from knowingly,

intelligently and voluntarily consenting to a search of his vehicle. We disagree.

After a careful review of the record, we find that the state has satisfied its burden. There was substantial evidence from which the trial court could have found that the defendant was capable of knowingly and intelligently consenting to a search of his vehicle. Yeomans observed Dennean read a "consent to search" form to the defendant and ask the defendant if he would authorize the police to search his vehicle. The defendant reviewed the form and signed it. "A defendant's express written and oral waiver is strong proof that the waiver is valid." *State* v. *Northrop*, supra, 213 Conn. 418; *State* v. *Chung*, supra, 202 Conn. 50–51. The defendant did not ask the detectives to explain any provisions in the consent form, and there is no evidence that he appeared confused, ill or intoxicated. In light of all the foregoing evidence, the defendant's learning disability is insufficient, without more, to invalidate his consent.

The state must also establish that the defendant voluntarily consented to a search of his vehicle. "Whether there was valid consent to a search is a factual question that will not be lightly overturned on appeal. *United States* v. *Sanchez-Jaramillo*, 637 F.2d 1094, 1098 (7th Cir.), cert. denied, 449 U.S. 862, 101 S. Ct. 166, 66 L. Ed. 2d 79 (1980)." *State* v. *Zarick*, 227 Conn. 207, 226, 630 A.2d 565, cert. denied, 510 U.S. 1025, 114 S. Ct. 637, 126 L. Ed. 2d 595 (1993). "The ultimate question 'is whether the will of the consenting individual was overborne, or whether the consent was his unconstrained choice.' *State* v. *Cobbs*, 7 Conn. App. 656, 659, 510 A.2d 213 (1986)." *State* v. *MacNeil*, 28 Conn. App. 508, 514, 613 A.2d 296, cert. denied, 224 Conn. 901, 615 A.2d 1044 (1992).

The record is devoid of any evidence that the police used threats, coercion or promises to induce the defendant to execute the consent form. Accordingly, the trial

court properly concluded that the defendant voluntarily consented to a search of his vehicle.

The judgment is affirmed.

In this opinion the other judges concurred.