[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
On August 30, 1994, the petitioner filed a pro se petition for a writ of habeas corpus, said petition being amended several times. The operative complaint, the third amended petition, was filed with the court on October 31, 2001, and alleges ineffective assistance of counsel through claims in seven counts. The petitioner claims that his confinement is illegal because the petitioner was denied his constitutional right to effective assistance of counsel as guaranteed by Article I, Section 8, of the Connecticut Constitution and the Sixth andFourteenth Amendments to the United States Constitution.
Count one alleges that trial counsel failed to investigate the petitioner's level of intellectual functioning; count two alleges that trial counsel's representation during plea bargaining was deficient; count three alleges that trial counsel failed to contest both the admissibility of post-arrest statements and the weight to be accorded to statements by the jury; count four alleges that trial counsel failed to permit the petitioner to make the decision whether or not to testify at the suppression hearing and before the jury during the trial; count five alleges that trial counsel failed to advise the petitioner concerning the right to a jury trial on Part B of the information; count six alleges that trial counsel was ineffective at the sentencing; and lastly, count seven alleges that trial counsel failed to pursue sentence review. The respondent's return denies the claims of ineffective assistance of counsel raised in all seven counts.
This matter was tried to the court over twelve days, beginning on December 12, 2001 and concluding on July 24, 2002. The court heard testimony from both the petitioner and his former trial counsel, as well as from various expert witnesses, including Attorneys William Paetzold, Hubert Santos and Thomas Farver, and Doctors Peter Zeman and Adam Jaffe. Numerous exhibits were entered into evidence, including the transcripts of the underlying criminal proceeding, several doctors' reports, a CT Page 4372 resurrected copy of Attorney Moscowitz's file, and copies of the petitioner's criminal record and Department of Children and Families ("DCF") record. At the request of counsel, this court permitted the filing of post-trial briefs, which the petitioner filed with the court on October 18, 2002, and the respondent filed with the court on December 2, 2002.
 UNDERLYING FACTS, PROCEDURAL HISTORY AND CRIMINAL CONVICTIONS
The facts giving rise to this case are set forth in State v. Groomes,232 Conn. 455, 459-62, 656 A.2d 646 (1995). "The facts are undisputed. There had been a large increase in the number of burglaries in the Westville area of the city of New Haven beginning in the first week of August 1991. In many of the burglaries, garages were broken into and bicycles were taken. In response, Detective Frederick Hurley and Officer Michael Pachesa of the New Haven Police Department conducted a stakeout in Westville on the night of September 14, 1991. The two officers, dressed in plain clothes, patrolled the area in a pickup truck. "The defendant was a suspect in the recent burglaries because he had been convicted of similar burglaries in the same area. Moreover, he had been released from prison in early August 1991. Not only were the officers aware of this information, but they also knew that the defendant lived about one-half mile from Westville, in the Valley Street projects. The officers had a picture of the defendant with them during the stakeout.
"At about 1:30 a.m. on September 14, 1991, Hurley saw the defendant riding a bicycle on Willard Street in Westville. There was nothing on the bicycle other than the defendant, and he did not appear to have anything on his back. The officers followed the defendant and saw him enter the backyard of a house on Willard Street, where, they knew, he did not live. The officers thereafter unsuccessfully searched several backyards on Willard Street, looking for the defendant. Forty to forty-five minutes later, the officers returned to their truck and resumed their patrol of the area.
"Shortly after resuming their patrol, the officers saw the defendant riding a bicycle on Barnett Street, also in Westville. At that time, the officers observed that the defendant had a backpack on his back and had an aluminum attache case strapped to the back of the bicycle, neither of which had been in his possession earlier. As the officers drove the truck toward the defendant, he jumped off the bicycle and ran into the backyard of a house, leaving the bicycle on the sidewalk. After calling for backup, the officers followed the defendant into the backyard, shouting `Police, stop.' CT Page 4373
"Andrew Faggio, a uniformed officer who responded to the backup call, subsequently apprehended the defendant in front of a school on Fountain Street. When Hurley arrived at the school, Faggio was trying to handcuff the defendant. Hurley noticed that the open backpack and books it contained bore the name Josh Forrest, which he knew was not the defendant's name. Hurley then performed a pat down search for weapons and placed the defendant under arrest, orally advising him of his Miranda
rights.
"The defendant indicated that he was willing to cooperate with the officers and took them to where he had hidden a video cassette recorder (VCR) that he had taken from a residence at 140 McKinley Avenue that night. After recovering the VCR, the officers and the defendant returned to the abandoned bicycle. There they found a video camera in the aluminum attache case, and a red duffel bag containing a Nintendo video game machine, video game cartridges and frozen food. In the bushes in the backyard on Barnett Street where the defendant had gone initially when he had run from the officers, they also found a flashlight, a metal bar and other tools, all of which were consistent with tools used to burglarize buildings.
"The officers next went to 140 McKinley Avenue where, the defendant had told the officers, he had stolen the recovered items. The defendant stated to the officers that he had gained access to the house by passing through a backyard on Willard Street, where the officers had seen the defendant earlier. After waking the occupants of 140 McKinley Avenue, the officers asked if anything was missing from their home. An occupant informed the police that a VCR, video camera, Nintendo machine and cartridges and frozen food were missing. In addition, the occupant verified that his son's book bag was missing, and that his son's name was Josh Forrest.
"The officers then took the defendant to the police station where Hurley again read him the Miranda rights, this time from a waiver form. After reading the rights form, the defendant initialed the waivers and signed the form at the bottom. He stated that he was willing to tell the officers about other burglaries that he had committed, and agreed to show the officers the locations of these burglaries. Hurley took a number of reports that had been filed concerning recent burglaries in the Westville area, and went with Pachesa to drive the defendant around the neighborhood.
"As they drove, the defendant pointed out garages or homes that he had entered and told the officers how he had gained entry and what he had taken. Hurley was able to match the details of what the defendant told CT Page 4374 him with many of the available burglary reports. The defendant indicated some locations, however, for which there were no reports, and there were some reported burglaries to which the defendant did not admit. He refused to sign a written statement regarding the burglaries. The defendant subsequently was charged only in connection with burglaries of those homes which he orally confessed to having burglarized."
The third amended petition alleges the following underlying facts, which the respondent does not contest.
On October 9, 1991, the petitioner was presented in CR6-347582 in the New Haven Superior, G. A. 6, on a forty-eight (48) count information that alleged offenses committed on different dates in August and September 1991 in New Haven. At his October 9, 1991 court appearance, bond was set and the Office of the Chief Public Defender was appointed to represent the petitioner. On October 21, 1991, the case, State v. Groomes, CR6-347582, was ordered transferred to Part A. On October 29, 1991, Assistant Public Defender Brian Carlow filed an appearance on behalf of the petitioner. Attorney Carlow filed a motion for appointment of a special public defender on November 1, 1991, citing a conflict of interest, and on or about November 8, 1991, Attorney Michael Moscowitz filed his in lieu of appearance on behalf of the petitioner in CR6-347582.
The petitioner's criminal trial took place over various dates, starting on January 26, 1993 and concluding with the sentencing on March 19, 1993. The petitioner was tried by a jury of six (6) on the first part of a twenty-four (24) count second amended long-form information dated February 3, 1993.
The first part of the two-part information alleged that the petitioner had committed the following offenses on various dates in August and September 1991: one count of Robbery in the first degree, in violation of General Statutes §§ 53a-134 (a)(4) and 53a-8; one count of Burglary in the first degree, in violation of General Statutes §§ 53a-101 (a) (1) and 53a-8; two counts of Burglary in the second degree, in violation of General Statutes § 53a-102; eighteen counts of Burglary in the third degree, in violation of General Statutes § 53a-103; one count of Attempted Burglary in the third degree, in violation of General Statutes §§ 53a-49 and 53a-103; and one count of Larceny in the second degree, in violation of General Statutes §§ 53a-123 (a)(1) and 53a-8.
On February 9, 1993, the petitioner's jury returned a verdict of guilty on each of the twenty-four counts in the first part of the two-part information. By way of a Part B information, the petitioner was charged CT Page 4375 with being a persistent serious felony offender, in violation of General Statutes § 53a-40 (b). On February 9, 1993, following a trial to the court, Fracasse, J., on the Part B information, the petitioner was found guilty as a persistent serious felony offender. On March 19, 1993, the petitioner was sentenced by the court, Fracasse, J., to serve a total effective sentence of seventy-five years in prison.
The petitioner appealed his convictions, which were affirmed by the Supreme Court in State v. Groomes, supra, 232 Conn. 455.
 STANDARD FOR INEFFECTIVE ASSISTANCE OF COUNSEL
"A convicted defendant's claim that counsel's assistance was so defective as to require reversal of the conviction has two components. First, the petitioner must show that counsel's performance was deficient. Second, the petitioner must show that the deficient performance prejudiced the defense. Unless a petitioner makes both showings, it cannot be said that the conviction resulted from a breakdown in the adversary process that renders the result unreliable. Stricklandv. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674, reh. denied, 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864 (1984); Aillon v.Meachum, 211 Conn. 352, 357, 559 A.2d 206 (1989); Fair v. Warden,211 Conn. 398, 402, 559 A.2d 1094, cert. denied, 493 U.S. 981,110 S.Ct. 542, 107 L.Ed.2d 514 (1989)." Henry v. Commissioner of Correction,60 Conn. App. 313, 316-17, 759 A.2d 118 (2000).
"Even if a petitioner shows that counsel's performance was deficient, the second prong, or prejudice prong, requires that the petitioner show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (Internal citations and quotations omitted.) Id., 317-18. See also Commissioner of Correction v. Rodriguez,222 Conn. 469, 477, 610 A.2d 631 (1992).
"In Strickland, the United States Supreme Court held that judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a petitioner to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the CT Page 4376 difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the petitioner must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. Counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." (Internal quotation marks omitted.) Minnifield v. Commissioner of Correction, 62 Conn. App. 68,71-72, 767 A.2d 1262, cert. denied, 256 Conn. 907, 772 A.2d 596 (2001).
"A reviewing court can find against the petitioner on whichever [Strickland prong] is easier. Valeriano v. Bronson, 209 Conn. 75, 85-86,546 A.2d 1380 (1988); Nardini v. Manson, 207 Conn. 118, 124, 540 A.2d 69
(1988); Magnotti v. Meachum, 22 Conn. App. 669, 674, 579 A.2d 553
(1990); Beasley v. Commissioner of Correction, [47 Conn. App. 253, 264,704 A.2d 807 (1997), cert. denied, 243 Conn. 967, 707 A.2d 1268 (1998)]."Petaway v. Commissioner of Correction, 49 Conn. App. 75, 76 n. 2,712 A.2d 992 (1998). "A court deciding an ineffective assistance of counsel claim need not address the question of counsel's performance, if it is easier to dispose of the claim on the ground of insufficient prejudice." Nardini v. Manson, supra, 207 Conn. 124.
 COUNT ONE
In count one, the petitioner alleges that trial counsel was ineffective because he failed to investigate the petitioner's level of intellectual functioning. More specifically, the petitioner alleges that Attorney Moscowitz's performance fell below that expected of a lawyer of ordinary training and skill in the criminal law because he failed to investigate the petitioner's life history, institutional history, substance abuse history, and psychological or psychiatric condition. It is alleged by the petitioner that by failing to have the petitioner evaluated by a learning or mental health specialist and failing to investigate the petitioner's personal history, especially because Attorney Moscowitz should have been alerted to the need to have a specific investigation of the petitioner's mental and physical history and condition, Attorney Moscowitz encountered difficulties in communicating with, counseling, advising and making decisions with the petitioner.
The petitioner alleges that a reasonably competent investigation of the petitioner and his background would have made it manifest that the petitioner was a client operating under disabilities affecting his judgment and his capacity to make prudent decisions with counsel. Additionally, the petitioner claims that a reasonably competent investigation would have disclosed ample information to confirm that the CT Page 4377 petitioner could not be counseled effectively unless counsel took measures specifically designed to overcome the petitioner's disabilities. Among the information that the petitioner claims would have been disclosed are the following: that the petitioner is an individual whose intellectual functioning is in the "borderline retarded" range; that the petitioner has an extensive history of institutionalization; that the petitioner's education was deficient; that the petitioner had been treated for several years with various prescribed psychotropic medications; and that the petitioner had for several years abused various illegal drugs.
Lastly, the petitioner alleges that he has poor memory skills and a limited ability for abstraction, that his abilities to learn, process and remember information are severely impaired, that his psychological condition made it difficult for him to understand the nature of the criminal proceedings against him in 1991, and that his psychological condition made it difficult for him to assist in his defense against the state's charges in CR6-347582. Consequently, according to the petitioner's claims, Attorney Moscowitz was unable to communicate effectively with his client in pretrial consultations and the setting of defense goals. Additionally, it is alleged that Attorney Moscowitz was also unable to advise his client effectively so that the petitioner could make informed decisions on critical matters in the case such as: whether to plea bargain or go to trial; what defenses to raise at trial; whether to testify at the suppression hearing concerning the petitioner's many alleged admissions to the police; whether to elect a jury or bench trial on part one of the information and/or part two of the information; whether to testify at trial; whether to help his attorney in gathering mitigating evidence that could be used at sentencing; and whether to seek sentence review.
The petitioner claims that because Attorney Moscowitz failed to conduct the kind of investigation reasonably called for under the circumstances of the petitioner's case, he was unable to represent the petitioner's legal interests with reasonable competence as required by the Sixth andFourteenth Amendments to the United States Constitution and Article I, § 8 of the Connecticut Constitution. What the petitioner specifically is not claiming, however, is that Attorney Moscowitz was ineffective for failing to seek a competency evaluation in accordance with General Statutes § 54-56d. Tr. (Dec. 12, 2001), at 72. Competency evaluations done under § 54-56d seek to determine whether "a defendant is . . . unable to understand the proceedings against him or to assist in his own defense." General Statutes § 54-56d (a). The finding of a defendant being not competent to stand trial serves as the basis for an affirmativedefense of mental disease or defect arising out of a defendants diagnosed mental illness. See, e.g., Copas v. Commissioner of Correction, CT Page 4378234 Conn. 139, 158-59, 662 A.2d 718 (1995).
Stated succinctly, the petitioner's claim in count one is that the petitioner received ineffective assistance of counsel because counsel, having failed both to have the petitioner evaluated by a mental health professional and to investigate the petitioner's mental and physical conditions, was not able to properly communicate with, counsel, advise and make decisions with the petitioner. It is alleged that this failure to investigate the petitioner's level of intellectual functioning, while not depriving the petitioner of an affirmative defense, resulted in counsel being unable to represent the petitioner's legal interests with reasonable competence.
This court notes that "[t]he standard we use to determine whether a defendant is competent under state law to stand trial is that set forth in Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824
(1960) (test for competence to stand trial is whether the defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational as well as factual understanding of the proceedings against him). The Dusky standard has been codified at General Statutes § 54-56d (a), which provides that a defendant shall not be tried, convicted or sentenced while he is not competent. For the purposes of this section, a defendant is not competent if he is unable to understand the proceedings against him or to assist in his own defense." State v. George B., 258 Conn. 779, 785-86,785 A.2d 573 (2001).
Thus, while the petitioner specifically avoids making a claim that trial counsel was ineffective for failing to seek a competency evaluation, the petitioner's claims in count one, as stated, focus on the petitioner's disabilities affecting his judgment, his capacity to make prudent decisions with counsel and his difficulty understanding the proceedings against him. Stated differently, the petitioner is alleging in count one that counsel's failure to investigate the petitioner's level of intellectual functioning ultimately prevented counsel from properly representing him, which given the facts of this case, includes potentially seeking a competency evaluation. And it is the petitioner who bears the burden of proof to show that any such failure prejudiced the petitioner, that is, "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Commissioner of Correction v.Rodriguez, supra, 222 Conn. 477.
The outcome of the petitioner's criminal case was a finding of guilty CT Page 4379 by a jury on the Part A information and a finding of guilty by the court on the Part B information. Consequently, to show that confidence in the outcome is undermined with sufficient probability, the petitioner must make a showing that it is reasonably probable that either the jury would have found him not guilty in the Part A information, that the trial court would have found him not guilty in the Part B information, or that the petitioner would have pleaded guilty instead of going to trial. Only if the petitioner makes the required showing as to one of these three possible alternative outcomes can the confidence in the outcome be undermined.
"[O]ur Supreme Court has repeatedly stated that a low level of education, although a factor to be considered, is not in and of itself, determinative. See State v. Correa, 241 Conn. 322, 335, 340, 696 A.2d 944
(1997) (admission of statements by suspect with only five years of education); State v. Madera, 210 Conn. 22, 43-44, 554 A.2d 263 (1989) (admission of statements by suspect who functioned at third grade level, could not read or write but could write his name, identify numbers and do some counting); State v. Hernandez, 204 Conn. 377, 397, 528 A.2d 794
(1987) (admission of statements by suspect with IQ in borderline mentally retarded range); State v. Toste, 198 Conn. 573, 581, 504 A.2d 1036 (1986) (admission of statements by suspect with low IQ, who functioned at sixth or seventh grade level)." Adorno v. Commissioner of Correction,66 Conn. App. 179, 185-86, 783 A.2d 1202, cert. denied, 258 Conn. 943
(2001), quoting State v. Santiago, 245 Conn. 301, 322, 715 A.2d 1
(1998).
The evidence in this case shows that the petitioner a had lengthy criminal record prior to his arrest on October 9, 1991, for the offenses at issue in the present petition. The petitioner's certified criminal record shows that the petitioner was arrested on ten (10) distinct dates between July 25, 1981, and October 26, 1987, prior to his arrest on October 9, 1991. Pet'r Ex. BB. With little exception, the offenses were all of the same nature as the offenses the petitioner currently is convicted of: burglary and larceny. The official copy of the petitioner's DCF record shows, in addition to his troubled youth and stunted intellectual development, that he had a predilection to committing breaking and entering offenses. Pet'r Ex. R. (At age 11, burglary and shoplifting; at age 13, committing a breaking and entering.)
The testimony by Attorney Moscowitz shows that he graduated from the University of Bridgeport Law School in 1980. Tr. (Dec. 12, 2001), at 77. While attending law school, Attorney Moscowitz worked as an investigator for the Public Defender's Office, beginning in the late 1970s as an investigator in the G. A. in Bridgeport, then as an investigator in the CT Page 4380 Juvenile Court in Bridgeport, and then as an investigator in the J.D. of Bridgeport. Id., at 77-78. As an investigator, Attorney Moscowitz investigated serious felony cases as well as misdemeanor cases. Id., at 78. Attorney Moscowitz testified that he was admitted to the Connecticut Bar in 1984, at which point he took a position as an assistant public defender in Bridgeport and later in Waterbury. Id. Attorney Moscowitz worked as an assistant public defender for less than ten years, initially doing G. A. and Juvenile cases, but then transitioning to carrying a caseload of approximately twenty (20) Part A criminal cases. Id., at 78-79. Attorney Moscowitz went into private practice in 1990 and was under contract to perform special public defender representation when he began representing the petitioner in November of 1991. Id., at 79-80; Pet'r Ex. D, at 2.
Attorney Moscowitz testified at the habeas corpus trial that the petitioner from the beginning was not interested in a plea bargain and wanted to go to trial. Tr. (Dec. 12, 2001), at 122. Attorney Moscowitz testified that the prosecutor in the petitioner's underlying criminal matter was willing to offer, as part of a plea agreement, that the petitioner serve fifteen (15) years. id., at 115. The state's offer for fifteen years was, however, contingent on the petitioner testifying against Sean Holland, a co-defendant in the offenses committed in the Bango residence. id. If the petitioner declined the fifteen-year offer because of his unwillingness to testify against Sean Holland, which is what occurred in this case, the state was nevertheless offering the petitioner a twenty-year sentence in exchange for a guilty plea. Id., at 116. Attorney Moscowitz also testified that the petitioner was unwilling to testify against Sean Holland because the petitioner had previously cooperated with the state and testified against someone,[1] but "had had an extremely difficult time in the correctional facility" because of that cooperation with the state. Id., at 115-16.
Attorney Moscowitz testified that the petitioner was charged with forty-six (46) counts prior to the trial, though the trial eventually only proceeded on the twenty-four (24) counts on which the petitioner was convicted. Id., at 117. Attorney Moscowitz also testified that he concluded that the petitioner potentially faced exposure to a long sentence. This potential arose from the numerous counts, the petitioner's extensive criminal record, Attorney Moscowitz's assessment of the state's case against the petitioner, as well as Attorney Moscowitz's experience with the sentencing judge. Id., at 117-19, 123 and 139. These factors combined led Attorney Moscowitz to press upon the petitioner the plea agreement. Id., at 122-24. Attorney Moscowitz continued to push the plea agreement until the commencement of trial in January of 1993. Id., at 123-24. CT Page 4381
"Because a defendant often relies heavily on counsel's independent evaluation of the charges and defenses, the right to effective assistance of counsel includes an adequate investigation of the case to determine facts relevant to the merits or to the punishment in the event of conviction. Regardless, counsel need not track down each and every lead or personally investigate every evidentiary possibility before choosing a defense and developing it." (Emphasis added.) (Internal citations and quotation marks omitted). Baillargeon v. Commissioner of Correction,67 Conn. App. 716, 721, 789 A.2d 1046 (2002).
As to his investigation into the petitioner's case prior to trial, Attorney Moscowitz testified that although he did not obtain any documents concerning the petitioner's past, he did go to Juvenile Court and made inquiries into the petitioner's history and background with both representatives of the State's Attorneys and the Public Defender's Offices at the Juvenile Court. Id., at 126-28. Through these inquiries, which were prompted by the petitioner expressing to counsel his anger toward "the system," Attorney Moscowitz learned that the petitioner's IQ was sixty-nine (69). Id. When questioned on direct examination, "Would having an IQ of sixty-nine mean anything to you as an attorney in terms of cognitive abilitities?" Attorney Moscowitz answered that "Sixty-nine is borderline retardation. You're not retarded, but it's a very low IQ. It doesn't mean you cannot function. You are functional but it . . . shows a very low IQ[.]" Id., at 129.
When asked whether in his "view it was not necessary to get an evaluation of [the petitioner] in order to be able to find ways of communicating to him that going to trial was very ill advice," Attorney Moscowitz responded that he has never used a psychological or psychiatric evaluation to assist him in convincing a client to take a plea offer.Id., at 130-31. Attorney Moscowitz did, however, acknowledge that such an evaluation could be of assistance in some sentencings, though the utility of an evaluation would depend upon how the sentencing judge would weigh such potentially mitigating information. Id., at 131. Attorney Moscowitz testified that based upon his experience before the petitioner's sentencing judge, such an evaluation would not have affected the sentencing judge's mind. Id. Attorney Moscowitz indicated that he did not even consider having an evaluation done subsequent to the conviction but prior to sentencing. Id., at 132.
The evidence shows that the petitioner refused to speak with the probation officer who prepared the Pre-sentence Investigation Report (PSI). Pet'r. Ex. G10. Thus, the probation officer was unable to update the petitioner's personal history via an interview with the petitioner. CT Page 4382Id. As a result of the petitioner's refusal to speak with the probation officer, the PSI for the March 19, 1993 sentencing relied to a great extent on the petitioner's documented past. The PSI completed for the March 19, 1993 sentencing concludes as follows: "A review of Mr. Groomes' arrest record and Department of Corrections' records reveals that for the past 14 years he has been incarcerated on nine different occasions. During these 14 years, Mr. Groomes has had a total of 22 months of freedom, with no more than 5 months of freedom at one time. His crimes are also very similar in nature, mostly burglaries.
"Before the Court, facing 26 counts of various B, C, and D felonies, is Bobby Groomes, a persistent serious felony offender. He was on SHR [supervised home release] for a period of 40 days, before being arrested on these instant offenses. Obviously, his periods of incarceration have meant nothing to him. A prognosis of his remaining in the community, free of criminal activity, is extremely poor. It appears that a lengthy period of incarceration is the Court's only alternative." Id.
The PSI for the March 19, 1993 sentencing had attached to it a PSI completed for the petitioner's August 26, 1988 sentencing for the convictions immediately preceding the convictions at issue in the present petition, and for which the petitioner had been released to supervised home release. The PSI for the August 26, 1988 sentencing contains, in relevant part, the following: "[The petitioner] stated he has a first grade education. It is difficult to determine the offender's exact education level[.] . . . He was found to be functioning in the `low range of borderline defective intelligence[.]' . . .
"Since his release from Cheshire [Reformatory] in 1981, the offender has been continually involved in criminal activity and has spent the majority of the past seven years in correctional facilities. Most recently, he was arrested for the Instant Offenses only three months after being released, which is a continuation of a long standing pattern of behavior . . .
"After reviewing all the information available on this offender, it is the opinion of this writer that he is clearly a victim of his environment and of society's failure to meet his needs as a young child. It appears that all the circumstances of his life could not help but result in an individual with no controls over his life. Unfortunately, at this time, it appears the only environment which is able to exert any control over this individual exists only in a correctional institution." Id. The probation officer who prepared the PSI in preparation for the August 26, 1988 sentencing concluded by recommending a lengthy period of incarceration, and the petitioner was sentenced on that date to a total CT Page 4383 effective sentence of fifteen (15) years, execution suspended after nine and one-half (9 1/2) years. Id.
The petitioner testified that his defense in this case was that he did not commit all the crimes he was charged with, but only the two burglaries the petitioner had just committed prior to being arrested by the police officers. Tr. (Mar. 7, 2002), at 13-14 and 16-17. The petitioner denied admitting to the police officers all the offenses identified in the Arrest Warrant Application. Id.; see also Pet'r Ex. G4. The petitioner testified at the habeas corpus trial that he told Attorney Moscowitz he wanted to testify, and that he did not hear Attorney Moscowitz tell the underlying judge that the petitioner did not want to testify. Tr. (Mar. 7, 2002), at 25. The transcript of the underlying trial shows the following colloquy:
MR. MOSCOWITZ: Your Honor, at this time I have had discussions with my client. I've indicated to him his rights concerning taking the stand and testifying. I've indicated to him that he has a right to take the stand, that I cannot prevent him from taking the stand and I cannot force him to take the stand. And we've had numerous discussions concerning this matter. And at the moment and at this very time he's indicated to me he does not wish to take the stand. So at this time the defense would rest, your Honor.
THE COURT: All right. Mr. Groomes, you've heard Mr. Moscowitz indicate his conversations with you regarding your right to testify.
MR. GROOMES: Yes.
THE COURT: Do you understand what Mr. Moscowitz has said?
MR. GROOMES: Yes.
THE COURT: All right. Do you understand that if you rest at this point we're going to proceed to argument and you will not have the opportunity to testify?
MR. GROOMES: Yes.
THE COURT: You understand that?
MR. GROOMES: Yes.
THE COURT: And it's wholly up to you to decide whether or not you want to testify. Of course you should listen to advice of Counsel, give it the CT Page 4384 weight you think it should be given, but your decision is the one that has to be made as to whether or not you will or will not testify. Do you understand that?
MR. GROOMES: Yes sir.
THE COURT: And do I understand that you have decided that you choose not to testify?
MR. GROOMES: Yes.
THE COURT: All right. All right. I'll ask the jury to come in and then Mr. Moscowitz, on the record you could indicate that the defense rests.[2]
Based upon the foregoing, this court finds not credible the petitioner's testimony that he wanted to testify but that he did not hear Attorney Moscowitz tell the judge he did not want to testify.
The petitioner's choice not to testify at trial is consistent with his choice not to testify in the hearing on the motions to suppress the statement given to police and any physical evidence obtained. At the hearing on the motions to suppress, Attorney Moscowitz advised the court as follows: "Your Honor, the record can reflect my client is present in court. Your Honor, I have discussed the matter with my client. He's indicated he will not take the stand at this time, not waiving his right to possibly taking the stand at a later time." Pet'r Ex. A (Tr. of Jan. 27, 1993, at 96). The trial court ultimately found that the petitioner had voluntarily and intelligently waived his rights, which "implicitly indicates he understood what he was doing." Id., at 127. The trial court's decision to deny the motions to suppress was affirmed on appeal.State v. Groomes, supra, 232 Conn. 476.
It is also noteworthy that the petitioner's "final claim [on appeal was] that the trial court failed to elicit, on the record, a proper waiver by the [petitioner] of his right to a jury trial on the charge of being a persistent serious felony offender. The [petitioner] argues that the record is silent as to the [his] election of a court trial, and that the court improperly accepted defense counsel's `bare assertion' of the [petitioner's] waiver. We disagree . . .
"[W]e conclude that the record is not silent with regard to the [petitioner's] election of a court trial on the persistent serious felony offender charge. Rather, it was only the [petitioner] who was silent. We decline to allow the [petitioner] to preserve a ground for appeal merely CT Page 4385 by refusing to respond to the court's questions regarding whether he waived his right to a jury trial."
The [petitioner's] refusal to respond to the court's questions does not constitute a silent record as to whether the [petitioner] had waived his right to trial by jury. The record here reflects that, not only did the [petitioner] discuss with his attorney the option of waiving a jury trial, but that he rejected the advice of his attorney by electing a court trial. The [petitioner's] counsel indicated to the [petitioner] the "problem" in not addressing the court in response to its canvass. What is reflected on the record is not a "bare" assertion by counsel, but rather a silent defendant who, through his attorney, made a voluntary, knowing and intelligent waiver of his right to a jury trial.
"The determination of whether there has been an intelligent waiver must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused. In this case, the [petitioner] knew that he was expected to answer the court's questions and that he could address the court directly. Earlier in the proceedings the [petitioner] had done so to request different counsel. Furthermore, the [petitioner] had had prior experience with the criminal justice system." (Emphasis added.) (Internal citation and quotation marks omitted). Id., at 474-76.
The petitioner did not testify in either the suppression hearing or at trial, as was his right. The state utilized the statement, which was the petitioner's admission to the underlying offenses, together with the testimony of the arresting police officers and the victims to prove the elements of the underlying offenses. At the habeas corpus trial, Attorney Moscowitz testified that he told the petitioner "he didn't have much of a case unless that statement was suppressed and the chances of suppressing that statement were very slim." Tr. (Dec. 12, 2001), at 125. Attorney Moscowitz testified that the petitioner, contrary to counsel's recommendations, decided to decline the plea bargain and proceed to trial. Id., at 126. And as to the advice given by Attorney Moscowitz to the petitioner about trying the Part B information to the court instead of to the jury, Attorney Moscowitz testified that he would have advised the petitioner, as he would with any other client with such extensive criminal history, to have the Part B information tried to the court instead of to a jury. Tr. (Dec. 14, 2001), at 29. Because the state need only prove the defendant's criminal record, a trial to the court instead of a jury may, according to Attorney Moscowitz's testimony, be taken into favorable consideration by the court at sentencing. Id. This court does not find that such advice by counsel was deficient. CT Page 4386
The petitioner attaches great importance to a handwritten note found amongst Attorney Moscowitz's resurrected trial file. On this note is the following question: "Client seems not there[.] Competency?" Pet'r Ex. G9; see also Tr. (Dec. 14, 2001), at 83 et seq. When questioned about this note during the habeas corpus trial, Attorney Moscowitz testified that he believed he wrote that note long before the underlying criminal trial. Tr. (Dec. 14, 2001), at 85. Attorney Moscowitz testified that competency "had been an issue in [his] mind. That's what . . . brought [him] to go to Juvenile Court to look into his juvenile record[.]" Id. Attorney Moscowitz could not specifically recall why the question of competency came to his mind when he represented the petitioner, but that because the petitioner was not the most intelligent individual and was unfocused on the pending criminal matters because of his anger toward the "system," Attorney Moscowitz contemplated the potentiality of having a competency evaluation done under § 54-56d. Id., at 86-87 and 89. Especially in light of Attorney Moscowitz's testimony that he had "done many 54-56d's, and in most cases [the defendants] are found competent[,]" this court finds credible Attorney Moscowitz's testimony and assessment that the petitioner was able to assist him and understand the proceedings against him. Id., at 87.
The final area which this court will address is the evidence and testimony by the expert witnesses in this case. Dr. Adam Jaffe, a Licensed Clinical Psychologist, evaluated the petitioner and concluded that the petitioner "presently [i.e., in 1996] has borderline competence to stand trial." Pet'r. Ex. O, at 9. Dr. Jaffe also concluded in his report that the petitioner's level of "competence to stand trial subsequent to his arrest in 1991 was likely to be significantly lower than his current level of borderline competence." Id. Dr. Jaffe evaluated the petitioner's capacity to understand the proceedings against him, his ability to assist in his defense and whether his waiver of the Miranda
rights was knowing, intelligent and voluntary. At the habeas corpus trial, Dr. Jaffe testified that it was his opinion, to a reasonable degree of medical certainty, that the petitioner's intellectual and cognitive abilities between 1991 and 1993 were very limited, and that the petitioner "seems to be deficient across most areas of intellectual functioning." Tr. (Jan. 9, 2002), at 22.
Dr. Jaffe testified as follows on cross-examination: "I think, in any case [the petitioner] would have at best . . . borderline competence[.] . . . A skilled attorney who understands his deficits, who approaches him a particular way that this client can accept, that he's not paranoid about, may bring him to an adequate level of competence . . . [C]learly a psychological evaluation was necessary in order to rehabilitate his competencies." Id., at 153. Dr. Jaffe also subsequently testified on CT Page 4387 cross-examination that though he had never done a competency evaluation as part of a criminal defendant's proceedings, in evaluating the petitioner he focused on the petitioner's competence and was attempting to assess the petitioner's competence, in particular between 1991 and 1993. Tr. (Jan. 10, 2002), at 70 and 84. The petitioner is, according to Dr. Jaffe's testimony, "capable of learning. The question is, do his deficits combined with his emotional difficulties in a particular instance allow him to make him able to do the tasks that we're talking about in this case in this instance. He may have been competent in some of those instances and noncompetent in some of them. What's most relevant is whether he was competent in 1991 to 1993." Id., at 84.
It is particularly noteworthy that the petitioner does not claim that his trial counsel was somehow deficient for failing to have a competency evaluation done in the 1991 to 1993 timeframe. The difficulty in retroactively attempting to assess the petitioner's 1991 to 1993 competence at some subsequent date for purposes of litigating the present habeas corpus petitioner is evident from the testimony and report by Dr. Peter Zeman, an expert witness for the respondent. Dr. Zeman, who at the time of the testimony in this case had been a psychiatrist for thirty-three years and was the president of the Institute of Living Medical Group, and whose practice consists of approximately forty to fifty percent forensic psychiatry, testified that he had performed hundreds of competency evaluations between 1985 and 1991. Tr. (Mar. 27, 2002), at 3-9. Specifically, Dr. Zeman indicated that he had performed "upwards of at least five or six hundred" competency evaluations during his thirty-three years as a psychiatrist specializing in forensic psychiatry. Id., at 15.
Dr. Zeman testified as follows regarding borderline intellectual functioning: "in most, if not all cases, [borderline intellectual functioning] does not have an effect upon [defendants'] competence to stand trial. People with borderline intellectual functioning are usually quite capable of understanding the proceedings, understanding what goes on in the courtroom and cooperating with their attorney, they may have to have some things explained to them a little bit more clearly and more slowly[.]" Id., at 17. Dr. Zeman concluded in his report that the petitioner was competent in 2001 to stand trial. Resp't Ex. 3, at 4-5. Dr. Zeman could not, however, determine with any degree of medical certainty whether or not the petitioner was competent between 1991 and 1993.
"It is certainly plausible, given the absence of psychotic illness and mental deterioration, that [the petitioner] possessed these competencies at the time of his arrest and trial. However, it is also possible that he CT Page 4388 gained competency in these areas only subsequent to his arrest and trial through self-education, assistance of fellow inmates, and instruction by his attorney. One simply cannot determine with any reasonable certainty whether he possessed sufficient knowledge for such competencies prior to his arrest and trial or, rather, gained this knowledge subsequent to those times . . . It is my further opinion that no mental health professional can determine with reasonable psychiatric or psychological certainty the presence or lack of competency in these areas in 1991 and 1993 from the vantage points of 1996, 1998, or 2001. Simply too manyvariables exist which cannot be accurately documented, placed in a cleartime frame, and analyzed after the fact to allow for a meaningfulretroactive determination of competency." (Emphasis added.) Id.
A third evaluation was also conducted by Dr. John Crouch, a clinical neuropsychologist, at the request of Dr. Zeman. Id., at 2. Dr. Zeman testified that he "sometimes request[s] a psychologist to do what's called psychological testing to provide [him] with another data base, which [he] can take into consideration as an ancillary or corollary source of information in forming a final opinion and [he] utilize[s] that to some degree, but . . . it doesn't replace or reach the importance of [his] own clinical assessment." Tr. (Mar. 27, 2002), at 22.
Most relevantly, Dr. Crouch's report concludes that the petitioner appeared competent to stand trial at the time Dr. Crouch evaluated him. Pet'r. Ex. Q, at 14. Dr. Crouch does conclude, however, that "based on deficits within his current evaluation results as well as his documented history of cognitive and psychiatric difficulties, Mr. Groomes' competence around the time of his 1991 arrest would likely have been lower than currently demonstrated. Without appropriate accommodations and education — neither of which are documented in his records — it appears unlikely that he would have been sufficiently capable of full participation." Id.
Dr. Crouch could not offer a clear opinion regarding the petitioner's capacity in 1991 to 1993 to understand the proceedings against him. Id.
With regard to his ability to assist in his own defense, Dr. Crouch was at best only able to speculate because of the lack of data regarding the petitioner's functioning at that time that it "appears probable that Mr. Groomes' understanding of legal issues was compromised around the time of his arrest and subsequent trial." Id., at 15. The petitioner's competency to waive his Miranda rights "was not addressed directly via the current assessment." Id. Dr. Crouch noted that the petitioner "is currently able to recall information from that time period in a manner that appears both valid and reliable," and that testing did "not necessarily preclude [the petitioner's] capability of remembering information regarding the alleged CT Page 4389 crimes for which he was convicted." Id., at 15-16.
Lastly, Dr. Crouch noted that in his "opinion, Mr. Groomes' long-standing history of psychiatric care, documented treatment with psychoactive medications, medical history, and substance abuse history clearly indicated a need for a Psychological and/or Neuropsychological Evaluation subsequent to his arrest. The lack of information from such assessments likely impeded an understanding of his limitations by various members of the legal process." Id., at 16. While Dr. Crouch's conclusions are similar to Dr. Jaffe's, both are too speculative in their conclusions about the petitioner's abilities or understanding of events between 1991 and 1993 to serve as a basis for this court's determination of the claim in this count: whether trial counsel was ineffective because he failed to investigate the petitioner's level of intellectual functioning.
Three legal experts testified at the habeas corpus trial: Attorneys William Paetzold, Hubert Santos and Thomas Farver. Attorney Paetzold testified that it was his opinion, when asked as to "what an attorney of ordinary training and skill in criminal law would do in representing Mr. Groomes — should do — in representing Mr. Groomes after reviewing the arrest warrant affidavit, . . . that lawyers should have taken substantial efforts into talking to Mr. Groomes to try to get him to see the fact that he had a very hopeless case to go to trial with and to try to persuade him to work out some type of plea agreement with the state." Tr. (Feb. 14, 2002), at 9. Attorney Paetzold testified that it was his "opinion . . . that Attorney Moscowitz should have conducted a fact investigation[.] . . . [A] lawyer . . . has a duty to investigate at least some of the claims that are contained to verify that, in fact, those burglaries occurred and also to investigate other evidence such as possible alibi defenses that a client provides." Id., at 12.
Attorney Paetzold also testified that it was his opinion "that if a client bases his defenses on the fact that he's not guilty and there's a confession involved, then you have to try to attack the confession by looking at either Miranda issues or any other issues that might come to light in your investigation and very often one of the issues that pertain to the Miranda is whether your client has any difficulty understanding advisement of rights. So you would consider a possible psychiatric or psychological evaluation." Id., at 13. If a client "such as Mr. Groomes who proclaims his innocence and . . . the attorney have reached the conclusion that there is no defense, but the client insists upon going to trial, making a decision over and against the attorney's advice, Attorney Paetzold provided his opinion that the attorney would talk with to [the] client up until the trial starts, try and to persuade the client to understand that there is no benefit by going to trial, that it's CT Page 4390 basically a suicide mission[.]" Id., at 17.
Attorney Paetzold further testified that "if you have information that brings to light that your client has a low IQ or borderline IQ and one of the issues or the only potential issue as a defense is the suppression of a confession, you get your client evaluated[.] . . . You retain a private psychologist or psychiatrist and start obtaining their social history because the psychiatrist or psychologist always requires that and then you have them perform an evaluation, hopefully that will give you some further insights into your client's background and also maybe helping you understand how to get through to the client." Id., at 22. The "getting through" that Attorney Paetzold was referring to is convincing the client of the futility of going forward with a trial. Id., at 27.
While Attorney Paetzold testified at some length regarding how he would use a psychological or psychiatric evaluation, he provided no evidence which shows that there is a reasonable probability that, but for counsel's error in failing to obtain such an evaluation, the result of any of the proceedings would have been different.
Attorney Farver, expert legal witness for the respondent, testified that if a criminal defense attorney has cause to believe that a client may not be competent during an attorney's representation, that such a competency evaluation under § 54-56d would be requested and granted. Tr. (Mar. 20, 2002), at 20. Attorney Farver also testified, however, that in his experience, he had never encountered the use of a psychiatric evaluation of a defendant for the purpose of understanding the defendant better or facilitate counseling the defendant to accept a guilty plea.Id., at 21. While Attorney Farver did not deny that such an evaluation might be useful in providing certain insights and that it might be a valid tactical decision to have an evaluation performed, to not have such an evaluation done did not fall below the standard of what a reasonably competent criminal defense attorney would do in the matter such as the petitioner's. Id.
The final legal expert to testify at the habeas corpus trial was Attorney Hubert Santos. Attorney Santos testified that based upon his review of the petitioner's case, he would have had a psychological or psychiatric evaluation done of the petitioner, even if it had not had utility for the purpose of eventually requesting a § 54-56d
competency evaluation. Tr. (July 24, 2002), at 38-39. Attorney Santos testified that such a psychological or psychiatric evaluation could potentially have been used during the plea bargaining or pre-trial stages to attempt to temper the sentence or mitigate the petitioner's conduct.Id., at 39. Attorney Santos also testified that such an evaluation could CT Page 4391 have also been used during a suppression hearing by allowing counsel to more effectively challenge the police officers by making reference to the petitioner's cognitive disabilities. Id., at 41-42. The utility of an evaluation for purposes of the jury trial was similar: it would have allowed counsel to raise questions as to the petitioner's disabilities.Id., at 43. Attorney Santos did acknowledge, however, that testimony by the petitioner at the suppression hearing or at trial regarding the voluntariness or intelligence of a waiver, especially based on a psychological or psychiatric report, would open the door to bringing in all the petitioner's prior convictions. Id., at 61.
Notably, Attorney Santos was not able to give an opinion when asked whether "an attorney who had not had a psychiatric evaluation of his client done [would] be at a substantial disadvantage in counseling his client." Id., at 45. Attorney Santos also testified he thought that "it was critical to [have a psychiatric evaluation done] to make the record for sentence review[.]" Id., at 49. When questioned on cross-examination whether an evaluation would have made any difference in the outcome of plea bargaining, the suppression hearing, the trial and at sentencing, Attorney Santos responded that he did not know whether an evaluation would have made any difference. Id., at 56-58, 63 and 69.
Based upon the foregoing, and viewing all the evidence in its totality, including the conflicting expert testimony, this court finds that the petitioner has not shown with the required degree of probability that either the jury would have found him not guilty in the Part A information, that the trial court would have found him not guilty in the Part B information, that he would have pleaded guilty instead of going to trial, or that the result of any of the proceedings would have been different. The petitioner has not made the required showing of prejudice and has failed to undermine this court's confidence in the outcome of the underlying proceedings. The claims in count one are, therefore, denied.
 COUNT TWO
The second count claims that because Attorney Moscowitz failed to properly investigate the circumstances of the petitioner's case, he was inadequately prepared and was unable to represent the petitioner effectively in pretrial bargaining with the State concerning the charges and the petitioner's exposure to lengthy incarceration. This claimed failure to investigate because of the petitioner's circumstances allegedly resulted in Attorney Moscowitz being inadequately prepared and unable to communicate effectively with the petitioner, and that thereby he was unable to advise the petitioner effectively concerning his decision whether to go to trial or to plead guilty. CT Page 4392
Based on this court's discussion and conclusions in count one, the court finds that the petitioner has not affirmatively shown with the required degree of probability that either the jury would have found him not guilty in the Part A information, that the trial court would have found him not guilty in the Part B information, or that he would have pleaded guilty instead of going to trial, or that the results of the proceedings would have been different. The petitioner has not made the required showing of prejudice and has failed to undermine this court's confidence in the outcome of the underlying proceedings. The claims in count two are denied.
 COUNT THREE
In the third count, the petitioner claims that because of the failure to conduct a reasonable investigation of the petitioner's history and psychological incapacities, Attorney Moscowitz did not represent the petitioner adequately in challenging the admissibility of incriminating statements that the petitioner allegedly gave to the police officers following his arrest. Furthermore, it is claimed that because of the failure to properly investigate, Attorney Moscowitz did not effectively represent the petitioner at his trial in that he failed to: contest the weight the jury should accord the petitioner's alleged admissions which were offered by the state in evidence against him at trial; cross-examine state's witnesses, present evidence in a defense case, and present a summation to the jury with the purpose of contesting the reliability of the alleged admissions.
Based on this court's discussion and conclusions in count one, the court finds that the petitioner has not affirmatively shown with the required degree of probability that either the jury would have found him not guilty in the Part A information, that the trial court would have found him not guilty in the Part B information, or that he would have pleaded guilty instead of going to trial, or that the results of the proceedings would have been different. The petitioner has not made the required showing of prejudice and has failed to undermine this court's confidence in the outcome of the underlying proceedings. The claims in count three are denied.
 COUNT FOUR
The fourth count alleges that while the petitioner expressed a desire to testify at his own trial, Attorney Moscowitz did not allow his client to testify on his own behalf during the trial, either at a hearing on a motion to suppress post-arrest statements or before the jury during the CT Page 4393 defense case. Consequently, it is alleged that the petitioner's right to effective assistance of counsel was violated when his attorney refused to accede to the petitioner's prerogative to decide to testify in his own defense.
The court does not find credible the petitioner's testimony at the habeas corpus trial about his desire to testify. Based on this court's discussion and conclusions in count one, the court finds that the petitioner has not affirmatively shown with the required degree of probability that either the jury would have found him not guilty in the Part A information, that the trial court would have found him not guilty in the Part B information, that he would have pleaded guilty instead of going to trial, or that the results of the proceedings would have been different. The petitioner has not made the required showing of prejudice and has failed to undermine this court's confidence in the outcome of the underlying proceedings. The claims in count four are denied.
 COUNT FIVE
The fifth count of the operative complaint claims that because Attorney Moscowitz failed to conduct a reasonable investigation of the petitioner's personal and institutional history and psychological incapacities, he failed to make his client understand that he was entitled to a jury trial on Part B of the state's information charging him with being a persistent felony offender. It is claimed that because of this defective performance by counsel, the petitioner waived his right to a jury trial on Part B of the state's information without understanding the consequences of his decision.
Based on this court's discussion and conclusions in count one, the court finds that the petitioner has not affirmatively shown with the required degree of probability that either the trial court would have found him not guilty in the Part B information, that he would have pleaded guilty instead of going to trial, or that the results of the proceedings would have been different. The petitioner has not made the required showing of prejudice and has failed to undermine this court's confidence in the outcome of the underlying proceedings. The claims in count five are denied.
 COUNT SIX
In the sixth count, the petitioner alleges because counsel failed to conduct a reasonable investigation of his client's personal and institutional history and psychological incapacities, Attorney Moscowitz failed to prepare for and represent the petitioner adequately at CT Page 4394 sentencing.
The transcript of the sentencing shows that the state's attorney recommended to the sentencing judge that the petitioner receive a sentence of sixty-three years. Pet'r Ex. B (Tr. of Mar. 19, 1993, at 8). The state's attorney noted that "sounds like a tremendous amount of time, but we're sentencing a tremendous number of crimes, which, as you can see in the PSI have severely affected most of these victims." Id.
Attorney Moscowitz raised the petitioner's history and background as discussed in the supplemental PSI attached to the March 19, 1993 sentencing PSI. Id., at 11-12. Attorney Moscowitz argued to the sentencing court that a sixty-year sentence is tantamount to institutionalizing the petitioner for the remainder of much of his life.Id., at 13. Attorney Moscowitz stressed the relative non-violence of the petitioner's offenses as a mitigating factor, and indicated to the sentencing court that if it wanted a recommendation from him, he felt a sentence of thirty to thirty-five years would be reasonable. Id., at 14-15. The petitioner himself did not address the court prior to the sentence being imposed. Id., at 15.
It is evident from the transcript that the sentencing court reviewed the PSI report. Id., at 16. After noting that the petitioner had committed the instant offenses shortly after being released on supervised home release, and drawing attention to the PSI report's summary of the petitioner's history and background, the sentencing court felt "it necessary that Mr. Groomes be incarcerated for an extended period of time in order to best serve the public interest and to protect the public. And bearing in mind the enhancement factor of the finding that he is a persistent serious felony offender, the sentences should be enhanced."Id., at 16-17. The court then imposed a total effective sentence of seventy-five years, consecutive to any other sentences the petitioner was subject to at that time. Id., at 18-19.
Based on this court's discussion and conclusions in count one, the court finds that the petitioner has not affirmatively shown with the required degree of probability that the outcome of the proceedings, including the sentencing, would have been any different. The petitioner has not made the required showing of prejudice and has failed to undermine this court's confidence in the outcome of the sentencing. The claim in count six is denied.
 COUNT SEVEN
The final count of the petition alleges that because counsel failed to conduct an adequate investigation into the petitioner's personal and CT Page 4395 institutional history and psychological incapacities, Attorney Moscowitz is alleged to have failed to adequately advise the petitioner concerning sentence review. Attorney Moscowitz did not make the petitioner understand the consequences of his decision not to seek sentence review in accordance with General Statutes §§ 51-194 51-197. As a result of counsel's failures, the petitioner did not file for, or receive, sentence review. Clearly, the relief sought by the petitioner is the restoration of his statutory right to have his sentence reviewed.
While the respondent's return denies the petitioner's claim that he is entitled to the relief sought in this count, this court notes that the respondent's post-trial brief states that the respondent now "believes that it is in the interest of justice to reinstate the petitioner's right to Sentence Review. In fact, it is apparent that this is the legitimate avenue for petitioner's complaints. It is clear that Groomes ignored counsel's advice and insisted on a trial from day one. Mr. Groomes testified to that. [Tr. (Mar. 7, 2002), at 41.] That was his right. The sentence imposed by Judge Fracasse is at the bottom of the petitioner's dissatisfaction." Ret., at 25.
The transcript of the sentencing shows that the petitioner received notice both of his right to appeal and of his right to pursue sentence review. Pet'r Ex. B (Tr. of Mar. 19, 1993, at 19). The transcript also shows that the petitioner refused to sign both his notice of the right to appeal as well as the notice of the right to sentence review. Id., at 19-20. At the habeas corpus trial, Attorney Moscowitz testified that he met with the petitioner subsequent to the sentencing so that the petitioner could sign the waiver of fees and costs and application for appointment of counsel on appeal, as well sign the application for sentence review. Tr. (Dec. 14, 2001), at 97-98. The petitioner, according to Attorney Moscowitz's testimony, refused to sign the paperwork to proceed with the sentence review in large part because of the shock and surprise following the imposition of the lengthy seventy-five year sentence. Id., at 98. The petitioner was "upset"; Id., at 99; and "extremely angry" immediately following the sentencing. Id., at 100.
Attorney Moscowitz further testified that he felt his performance was deficient in that he should have let the petitioner calm down for several days subsequent to the sentencing, and that he should have approached the petitioner again to discuss sentence review after such a "cooling down" period. Id., at 99-100 and 102. While Attorney Moscowitz did not know how the petitioner would react if he had approached him after a cooling down period, Attorney Moscowitz testified that in his professional judgment, the petitioner would have calmed down, been less hostile and more concerned about appealing the conviction and pursuing sentence review. CT Page 4396Id., at 102-03. It is particularly noteworthy that Attorney Moscowitz only met once with the petitioner to discuss sentence review: immediately following his sentencing. The petitioner could have filed the application for sentence review within thirty days of sentencing. General Statutes § 51-195.
Without addressing the petitioner's reliance on the failure to investigate the petitioner's background and psychological incapacities for the granting of the relief sought, this court finds that Attorney Moscowitz's failure to follow-up with his client at any time during the thirty days after sentencing fell below the standard of a reasonably competent criminal defense attorney in this state. Given the lengthy sentence of seventy-five years and its impact on the petitioner, as well as the circumstances of this case, a reasonably competent criminal defense attorney would have followed up with a client after allowing the client a period of time to quiet down and re-assess the merits of sentence review. Though Attorney Moscowitz had a full month to re-visit the issue of sentence review with the petitioner, he did not. This failure by counsel was deficient and prejudiced the petitioner, for it is reasonably probable that, but for counsel's deficient performance, the petitioner would have filed the application for sentence review.
Thus, the relief sought in count seven is granted in that the petitioner's right to sentence review is restored. The petitioner's right to file an application for sentence review with the clerk of the court for the judicial district in which the judgment was rendered hereby is restored for a period of thirty (30) days from the date of the this decision. General Statutes § 51-195.
 CONCLUSION
For all the foregoing reasons, the petitioner's claims in counts one through six are denied. The relief sought in the seventh count, namely the restoration of the right to sentence review, is granted for a period of thirty (30) days from the date of the decision. Judgment is entered in accordance with this memorandum of decision.
GRAZIANI, J.